Gordon, Robert B., J.
The plaintiffs, four private citizens and two nonprofit organizations, allege in their two-count Complaint that the defendant, Massachusetts Department of Environmental Protection (“DEP” or the “Department”), has failed to perform statutorily mandated duties under a particular subsection of the Global Warming Solutions Act — namely, G.L.c. 21N, §3(d). The plaintiffs now move for a declar-atoiyjudgment on the pleadings and/or the issuance of a writ of mandamus to DEP. The Department opposes the plaintiffs’ motion, and requests entry of a declaratory judgment in its favor. The Court held a hearing on March 9, 2015 and heard extensive arguments. For the reasons set forth below, the plaintiffs’ motion will be DENIED, and a declaratory judgment shall enter in favor of the defendant.
BACKGROUND
The following background facts are taken from the allegations in the Complaint and the exhibits attached thereto, which the Court accepts as true for purposes of the present Rule 12(c) motion. See Wheatley v. Massachusetts Insurers Insolvency Fund, 456 Mass. 594, 596 (2010). The Court reserves certain facts for later discussion.
Enacted in 2008, the Global Warming Solutions Act (“GWSA” or the “Act”) is a legislative scheme designed to address the effects of climate change in the Commonwealth by promoting “green” economic initiatives and reducing greenhouse gas emissions.[2] The GWSA imposes certain duties on various Massachusetts executive offices and agencies. For example, the Act requires the Secretary of Energy and Environmental Affairs (the “Secretary”) to adopt a statewide greenhouse gas emissions limit for the year 2020. See G.L.c. 21N, §3(b). A separate but related section of the law provides the algorithm by which the Secretary’s 2020 emissions limit must be calculated. Id. at §4(a). The GWSA provision at issue in the present case (“Section 3(d)”) specifically provides as follows:
The department shall promulgate regulations establishing a desired level of declining annual aggregate emission limits for sources or categories of sources that emit greenhouse gas emissions.
G.L.c. 21N, §3(d).[3] Regulations issued by DEP pursuant to §3(d) were to be instituted by January 1, 2012, take effect on January 1, 2013, and expire on December 31, 2020. See St. 2008, c. 298, §16. The statutory deadline for issuing §3(d)-compliant regulations came and went in January 2012, without any Department action taken pursuant to this subsection.
In November 2012, a group of Massachusetts residents — including some of the plaintiffs in the case at bar — submitted to the Department a rulemaking petition seeking regulations that would strictly control greenhouse gas emissions, citing the DEP’s authorify under §3(d).[4] Various environmental advocacy organizations, as well as multiple health care and business interests, supported the petition. At that time, the Department had promulgated a number of regulations pursuant to authorify granted in other GWSA provisions, but had not yet expressly taken action under §3(d).
DEP held a public hearing on June 13, 2013 to consider and discuss the petition. Shortly after the hearing, DEP issued a written statement in response to the petitioners’ demands, outlining the Department’s decisions and the reasons therefor. In broad compass, DEP’s position was that it had complied with all requirements of the GWSA, including those set forth in §3(d). The DEP statement listed specific regulatoiy schemes the Department had established to reduce greenhouse gases and combat climate change, including prescribed limits on sulfur hexafluoride (SFg) leaks, a regional cap and trade market to manage carbon dioxide (C02) emission allowances, and a Low Emission Vehicle (LEV) program addressed to automobile emissions. The Department asserted that such initiatives (singly or in combination) fulfilled the §3(d) mandate. DEP took no further action at that time.
On August 11, 2014, the plaintiffs filed their Complaint with this Court. The plaintiffs seek a declaratory judgment or, in the alternative, a writ of mandamus, asserting that DEP has failed to meet its statutory mandate to issue regulations compliant with §3(d) of the GWSA. DEP counters that it has satisfied the requirements of §3(d), fairly construed, and therefore requests that a declaratory judgment to this effect enter in its favor as a matter of law.
DISCUSSION
The parties agree that the pleadings present no disputes of material fact, and that the sole question presented for decision in this matter turns entirely on statutory interpretation. Judgment on the pleadings is thus proper under Mass.R.Civ.P. 12(c). See Tanner v. Board of Appeals of Belmont, 27 Mass.App.Ct. 1181, 1182 (1989); see also Commonwealth v. Richards, 426 *670 Mass. 689, 691 (1998) (a matter of statutory interpretation presents a “pure issue of law”).
I. Standard of Review
“The duty of statutory interpretation is for the courts, but an administrative agency’s interpretation of a statute within its charge is accorded weight and deference. Where the agency’s statutory interpretation is reasonable, the court should not supplant its judgment.” Dowling v. Registrar of Motor Vehicles, 425 Mass. 523, 525 (1997), quoting Massachusetts Medical Soc’y v. Commissioner of Ins., 402 Mass. 44, 62 (1988). Such deference is required even where the statutory language may be ambiguous. See Alliance to Protect Nantucket Sound v. Department of Pub. Utils., 461 Mass. 166, 182 (2011). In the present case, it is the plaintiffs’ ultimate burden to show that (1) DEP’s interpretation of the GWSA is invalid and (2) the Department’s actions taken thereunder are insufficient as a matter of law to meet the mandate of the statute. See Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006).
II. G.L.c. 2 IN, §3(d)
With a legislative enterprise as broad and complex as the GWSA, “there are likely to be casual overstatements and understatements, half-answers, and gaps in the statutory provisions. As practice develops and the difficulties are revealed, the courts are called on to interweave the statute with decisions answering the difficulties and composing, as far as feasible and reasonable, an harmonious structure faithful to the basic designs and purposes of the Legislature.” Mailhot v. Travelers Ins. Co., 375 Mass. 342, 345 (1978) (discussing interpretation and application of Massachusetts “no fault” insurance statutory scheme). Various factors may be relevant to statutory interpretation, but the most important is legislative intent. See Quincy City Hosp. v. Rate Setting Comm’n, 406 Mass. 431, 449 (1990).
Here, the parties offer two competing interpretations of §3(d). The plaintiffs argue that its language reflects a legislative intent for DEP to issue strict, numerical, enforceable limits — what they characterize as “mandatory restraints” — on greenhouse gas emissions for sources or categories of sources of greenhouse gases. DEP, on the other hand, focuses on the phrase “a desired level of’ in §3(d), and asserts that the law mandates only that the Department establish aspirational or “target” emissions levels for sources or categories of sources of greenhouse gas emissions. DEP further maintains that it has satisfied such mandate through its development of three separate regulatory schemes: the SFg leakage limits, the C02 allowances market, and the LEV program.
Upon review, the Court has determined that it need not decide which (if either) party’s reading of §3(d) is correct in this regard; because, under either construction of the statute, and according the agency the deference to which it is entitled by law, DEP has fulfilled the essential mandate of §3(d). The plaintiffs argue that §3(d) imposes a six-part mandate on any action taken by the Department. In -their view, such action must be a (1) declining, (2) annual, (3) aggregate, (4) regulation, which places (5) limits (and not merely reduction targets) on (6) sources or categories of sources of greenhouse gas emissions. Ultimately, and even conceding arguendo the plaintiffs’ reading of the statute, it is evident that DEP has in substance met all six elements — in its SFg regulations, through the C02 emissions market, and with the Department’s LEV program. The Court regards the plaintiffs’ various quarrels with the regulatoiy actions of DEP as hypertechnical and overly exacting, and concludes the Department is in fact substantially fulfilling the legislative expectations of the GWSA in a reasonable manner.
A. SFg Regulations
DEP has regulated SFg gas emissions in the Commonwealth since April 2014. The Department’s regulations proscribe excessive leakage of SFg from electrical power system equipment insulated with SFg gas, known as gas-insulated switchgear, or GIS. See 310 C.M.R. §772. The Legislature considers SFg a “greenhouse gas” falling under the coverage of the GWSA. See G.L.c. 21N, §1. DEP’s expressly stated purpose behind the SFg regulations is to reduce greenhouse gas emissions. See 310 C.M.R. §772(1).
The SFg regulatory scheme provides maximum annual rates of allowable SFg gas leakage for GIS in Massachusetts.[5] The Department has established a calendar of decreasing rate limits — beginning with a 3.5% leakage rate allowed in 2015, and ending with a 1.0% leakage rate allowed in 2020. The SFg regulations also require any newly-manufactured GIS to comply with the 2020 emissions rate of 1.0%. The rates themselves are calculated by dividing the total amount, in pounds, of SFg gas leaked by a facility over the previous year by the total SFg gas capacity of all active GIS equipment in the facility. Non-compliance by a GIS owner, lessor or operator may result in administrative penalties, including the imposition of a fine not to exceed $25,000 for each violation. See G.L.c. 21 A, §16; G.L.c. Ill, §142A.
The plaintiffs first argue that utilization of a rate scheme instead of a specified numerical limit on total greenhouse gas emissions runs counter to the language of §3(d). However, nothing in the text of §3(d) or in the record before the Court indicates that a declining maximum permissible rate of greenhouse gas emissions is not an acceptable limit thereon within the intention of this provision of the statute. Through the SFg regulations, DEP has established fixed, enforceable rates of — indeed, “mandatory restraints” on — SFg leakage, which leakage limits decrease every year. This is the stated dictate of the GWSA. To say that such a scheme has not set a fixed “limit” on greenhouse gas emissions themselves cramps the language of the law beyond fair meaning. See Wheatley, 456 Mass. at 606.
*671 Second, the plaintiffs insist that the calculation of the SFg limits does not accord with the requirements of §3(d). GX.c. 21N, §1 defines a “greenhouse gas emissions limit” as “an authorization, during a specified year, to emit up to a level of greenhouse gases specified by the secretary, expressed in tons of carbon dioxide.” The plaintiffs argue that, because the SFg limits are expressed in pounds of SFg rather than tons of C02, the regulation’s defined measure of the limit is improper. However, G.L.c. 2 IN, §1 also indicates that its definitions apply “unless the context clearly requires otherwise.” Section 3(d) is just such a context. Section 3(d) is specifically directed at DEP, whereas the definition of “greenhouse gas emissions limit” is explicitly aimed at regulations issued by the Secretary of Energy and Environmental Affairs. See id. (“an authorization ... to emit up to a level of greenhouse gases specified by the secretary”) (emphasis added). For this reason, the general GWSA definition of greenhouse gas emissions limit does not, by its terms, control Department regulations issued pursuant to §3(d), and emissions limits expressed in pounds of SFg leaked (rather than tons of CO2) is not improper. Cf. Ginther v. Commissioner of Ins., 427 Mass. 319, 324 (1998) (“Where the Legislature used different language in different paragraphs of the same statute, it intended different meanings”).
The plaintiffs additionally argue that the SFg regulations do not impose “aggregate” limits on emissions under §3(d), because the rules do not restrict new sources of SFg from entering the market. Inasmuch as the Act contains no definition of “aggregate,” the Court is called upon to construe the term in accordance with its commonly understood meaning and usage. See Commonwealth v. Welch, 444 Mass. 80, 85 (2005). In this regard, the plain language of the law, considered in the light of its declared legislative purposes, is paramount. See Water Dep’t of Fairhaven v. Dep’t of Envtl. Protection, 455 Mass. 740, 744 (2010). Importantly, the meaning of the statutory language (and the resolution of any ambiguity therein) “is determined not only by reference to the language itself, but as well by the specific context in which the language is used, and the broader context of the statute as a whole." Yates v. United States, U.S. Supreme Ct., No. 13-7451, slip op. at 7 (Feb. 25, 2015).
Webster’s New World Dictionary defines “aggregate,” in relevant part, to mean “collective, as [in] . . . taking all units as a whole.” This definition of “aggregate” accords with the general usage of the term, and the plaintiffs have not argued that any other definition applies in the context of §3(d). Considering the word’s commonsense meaning in light of the statutory context in which it is used, the Court has little difficulty concluding that the SFg regulations prescribe “aggregate” greenhouse gas emissions limits. The SFg rules apply to all GIS owners, lessors, operators and controllers in the Commonwealth, with only narrow exceptions. See 310 C.M.R. §7.72(3). Further, the regulations apply to all active GIS within a facility, without exception. See id. at §7.72(5). As such, the rules impose a collective limit on all units (pounds) of SFg leaked in every facility under the regulations’ authority. This would appear to be the very definition of an “aggregate” limit.
Further to the above, the SFg scheme implemented by DEP instructs that any new, active GIS must not exceed a maximum 1.0% leakage rate, the most restrictive rate imposed by the regulations. Contrary to the plaintiffs’ argument, the plain language of §3(d) does not invest DEP with the authority to go beyond placing emissions limits on known sources of greenhouse gases and prohibit entirely new and potential sources of greenhouse gases from emerging in the Commonwealth. The Court declines to read into the law a requirement that the Legislature did not explicitly enact. See Beeler v. Downey, 387 Mass. 609, 617 (1982).
For the foregoing reasons, the plaintiffs’ challenge to the “aggregate” nature of DEP’s SFg regulations fails the test of fair statutory construction. Accordingly, the plaintiffs have not shown that, as a matter of law, the SFg regulations do not reasonably satisfy the Department’s statutory mandate under §3(d).
B. The Massachusetts C02 Budget Trading Program
Pursuant to G.L.c. 21A, §22, DEP has implemented the Massachusetts C02 Budget Trading Program (the “Program”), which tracks the model rules of the Regional Greenhouse Gas Initiative (RGGI) and applies the RGGI standards in Massachusetts. See 310 C.M.R. §7.70; G.L.c. 21A, §22. The plaintiffs maintain that the current version[6] of the Program does not fulfill the requirements of §3(d). The Court disagrees.
The RGGI is a cap and trade program involving electricity-generating facilities, such as power plants, which produce C02. See G.L.c. 21A, §22(a). C02 is considered a greenhouse gas under the GWSA. See G.L.c. 21N, §1. The RGGI has created a market in which certain producers of C02 in the northeastern United States can buy and sell a limited amount of emissions allowances. See G.L.c. 21A, §22(b). The number of allowances issued for the production of C02 in the region is determined by dividing a maximum amount of C02, measured in tons, among the nine states participating in the RGGI. See RGGI Fact Sheet, Regional Greenhouse Gas Initiative, Inc., at http: //rggi.org/docs/Documents/RGGI_Fact_Sheet .pdf (last viewed Feb. 25, 2015). The maximum aggregate amount of C02 to be produced across all RGGI states decreases by 2.5% each year, through 2020. Id.
In 2007, Massachusetts became part of the RGGI. Thereafter, the Legislature charged DEP with enforcing RGGI rules in order to “reduce the total [C02] emissions released by electricfity] generating stations.” G.L.c. 21A, §22(b). The Department then estab *672 lished the Program, Incorporating the RGGI scheme into its regulations and issuing a schedule of annual declining aggregate C02 emissions limits for producers in the Commonwealth. See 310 C.M.R. §7.70(5)(a). The base amount of C02 emissions currently allocated to Massachusetts for 2015 is 14,124,929 tons. Id. This amount declines by roughly 2.5% each year, through 2018, when the Massachusetts base budget will be 13,282,560 tons of C02. Id.
The plaintiffs first take issue with the region-wide RGGI marketplace for buying and selling emissions allowances, because Massachusetts participants could, in theory, purchase enough allowances to exceed (collectively) the tons of C02 allotted to Massachusetts. The plaintiffs argue that such a scheme does not effectively limit the amount of C02 emitted in the Commonwealth. This argument fails to persuade for each of two reasons. First, §3 (d) does not specifically restrict to Massachusetts any actions taken by the Department under §3(d). Rather, it requires only that DEP generally place limits on emissions from sources or categories of sources of greenhouse gases (and the Court noting in this connection that this species of air pollution presents as a regional problem). Once again, the Court declines to read into the law a more granular emissions reduction mandate that the Legislature did not explicitly impose. See Beeler, 387 Mass. at 617. Second, based on the plain language of the statute — and according to the plaintiffs’ own proposed six-part test — §3(d) is not so broad as to require DEP to issue regulations targeting all greenhouse gas emissions in the entire state. The language is much more narrowly drawn, mandating the imposition of limits on particular sources or categories of sources of greenhouse gas emissions. The Program, through the mechanisms of the RGGI, does precisely that, placing limits on the amount of C02 that can be produced by Massachusetts power plants.
The plaintiffs alternately argue that any limit placed on C02 producers through the RGGI system is illusory, because the Program makes reserve allowances, beyond the initial allotment, available for purchase under certain circumstances. See 310 C.M.R. §7.70(1) (b) (defining C02 Cost Containment Reserves). True though that is, §3(d) does not prohibit the Department from hewing exceptions into any set emissions limit. If §3(d) did impose such an inflexible restriction, it would entail a departure from the manner in which DEP customarily implements hard limits. In the ordinary course, DEP’s public safety regulations allow for exceptions to generally-imposed limits or requirements. See, e.g., 310 C.M.R. §7.08(2)(g)(4) (allowing facilities to apply for waivers from mercury emissions limit regulations if compliance not otherwise feasible); 310 C.M.R. §22.13 (allowing variances for public water systems that cannot meet prescribed maximum contaminant levels in drinking water); 310 C.M.R. §30.1100 (establishing availability of waivers for certain refuse and activities not subject to hazardous waste regulations); 310 C.M.R. §60.02(3) (providing exceptions to motor vehicle inspection requirements under air pollution control regulations). “It is not likely supposed that radical changes in the law were intended where not plainly expressed.” Wheatley, 456 Mass. at 607. Therefore, the Court finds it doubtful that the Legislature intended to impose as strict a mandate on DEP as the plaintiffs assert, especially where the law may be reasonably construed otherwise. See Molly A. v. Commissioner of the Dep’t of Mental Retardation, 69 Mass.App.Ct. 267, 282 (2007) (courts should avoid an “unreasonable result when statutory language is susceptible of a sensible, workable construction”); see also Johnson’s Case, 318 Mass. 741, 746 (1945) (a statute “ought, if possible, to be so construed as to make it an effectual piece of legislation in harmony with common sense and sound reason”).[7]
Plaintiffs claim that any finding that the Program satisfies the requirements of §3(d) renders the Act’s preceding section, §3(c), redundant. Section 3(c) specifically provides:
Emissions levels and limits associated with the electric sector shall be established by the executive office and the department, in consultation with the department of energy resources, based on consumption and purchases of electriciiy from the regional electric grid, taking into account the regional greenhouse gas initiative and the renewable portfolio standard.
G.L.c. 2 IN, §3(c). It is well settled that statutes must be read holistically, avoiding interpretations that would render a provision “inoperative or superfluous.” Wheatley, 456 Mass. at 601. However, a comparison of the language of Sections 3(c) and 3(d) reveals no threatened redundancy of the sort suggested by the plaintiffs. Section 3(c) grants the Department broad authority to establish, generally, emissions limits “associated with the electric sector.” Section 3(d), on the other hand, prescribes a much more specific type of regulation: desired levels of declining annual emissions limits for sources or categories of sources of greenhouse gases. The plaintiffs offer no concrete reason why DEP could not reasonably establish emissions limits associated with the electric sector that reflect desired levels of declining annual emissions limits — such as those promulgated through the Program — and thereby satisfy both statutory mandates at once.
It is certainly true that the Secretary’s office fulfills two separate GWSA directives when it issues 2020 statewide greenhouse gas emissions limits under §3(b) (“The secretary shall . . . adopt the following [2020] statewide greenhouse gas emissions limit . . .”), and simultaneously calculates what the specific limits will be under §4(a) (“[T]he 2020 statewide greenhouse gas emissions limit . . . shall be between 10 per cent and 25 per cent below the 1990 emissions level...”). These interrelated and complementary mandates for the Secretary do not render either section of the law superfluous or inoperative. The Department has reasonably fulfilled the more specific requirements of §3(d), and *673 done so in accordance with the broader regulatory authority granted to it in §3(c).[8] For this reason and the foregoing, the plaintiffs have not carried their burden to establish that DEP’s action is either improper or insufficient as a matter of law.[9]
C. The LEV Program
In 1990, Massachusetts adopted California’s system of regulating motor vehicle greenhouse gas emissions. See St. 1989, c. 410, enacted as G.L.c. Ill, §142K (1990). At that time, the Legislature charged DEP with setting and administering standards for motor vehicle emissions, in order to reduce air pollution from automobiles. See G.L.c. 11, §142K (1990). Accordingly, the Department issued a set of regulations (known as the Low Emission Vehicle (“LEV’) Program) which incorporated California’s regulatory scheme. See 310 C.M.R §7.40; Cal. Code Regs., tit. 13, §1961.3. The plaintiffs argue that DEP’s revised LEV regulations, effective December 2012, do not fulfill the requirements of §3(d). Again, the Court does not agree.
The LEV regulations provide that all manufacturers who sell passenger cars, light-duty trucks, and medium-duly passenger vehicles must meet certain declining yearly exhaust standards. See 310 C.M.R §7.40(2). The exhaust standards are measured by calculating the mass of non-methane organic gas emitted from the average vehicle in a manufacturer’s fleet, expressed in grams per mile. See id. at §7.40(1); Cal. Code. Regs., tit. 13, §1961.1. The maximum allowable average emissions decline each “model year,” which Massachusetts defines as “a manufacturer’s annual production period which includes January 1st of a calendar year or, if the manufacturer has no annual production period, the calendar year.” 310 C.M.R §7.40(1).
The plaintiffs first assert that the LEV regulations do not fulfill the §3(d) mandate for limits on “aggregate” emissions, because they impose average emissions limits for entire fleets of vehicles. The plaintiffs maintain that these regulations could satisfy the requirements of §3(d) only if the number of vehicles per fleet were also limited, as increasing sizes of fleets will inevitably increase the total mass of exhaust fumes emitted. This argument is similar to one advanced by the plaintiffs in challenging the SFg and RGGI regulations, and it fails for similar reasons. First, §3(d) plainly does not authorize DEP to regulate the number of vehicles manufactured and sold in Massachusetts. Section 3(d) merely instructs DEP to issue regulations that apply emissions limits to certain sources or categories of sources of greenhouse gases. The Department has appropriately done so through LEV regulations that target certain motor vehicles that emit greenhouse gases.
Second, even if DEP possessed the authorfly to regulate the size of motor vehicle fleets, doing so is clearly not required under §3(d). Section 3(d) does not require DEP to limit the total amount of greenhouse gases emitted by all sources thereof. Rather, the Legislature has imposed that duty on the Secretary, through its mandate to issue the 2020 statewide greenhouse gas emissions limit. See G.L.c. 21N, §3(b). By contrast, §3(d) only requires that DÉP set aggregate limits for specific sources of greenhouse gas emissions. Considering the more narrow purpose of §3(d), an interpretation of “aggregate . . . emissions limit” to mean a functional limit on all greenhouse gases emitted in the Commonwealth would be unreasonable and impracticable. The Court believes that this could not likely have been intended by the Legislature. See Attorney Gen. v. School Comm. of Essex 387 Mass. 326, 336 (1982) (‘We assume the Legislature intended to act reasonably”).
The plaintiffs also assert that the LEV regulations, by allowing emissions limits to decline according to a manufacturer’s model year, fail to satisfy the requirement of §3(d) that any limit must decline “annually.” The GWSA does not define “annually,” so the Court construes the term according to its commonly understood meaning and usage. See Commonwealth v. Welch, 444 Mass. 80, 85 (2005). Anatural reading of§3(d) suggests alegislative intent that any emissions limit set by DEP must decline on a yearly basis. The plaintiffs do not appear to disagree with such an assessment. So construed, the fact that exhaust standards promulgated under the LEV regulations could decline eveiy model year, rather than every calendar year, would not seem to subvert the intent of the Legislature. The regulations themselves define a manufacturer’s model year to be an “annual” production period. See 310 C.M.R §7.40(1). Logically, this implies that a full production period is completed at least once every 365 days. Thus, if an exhaust standard declined every model year, it would decline successively and at least once per year. This surely comports with the Legislature’s interest in enacting a statute that requires “annual” declines in emissions limits.
For the reasons discussed above, DEP’s LEV regulations reasonably fulfill the §3(d) requirements, even as the plaintiffs conceive them, by imposing declining annual aggregate motor vehicle exhaust limits for certain automobiles sold in the Commonwealth. The pleadings permit no fair conclusion to the contrary.
III. Requested Relief
The plaintiffs seek issuance of a writ of mandamus to the Department or, in the alternative, a declaratory judgment in their favor. Mandamus is proper “where a public officer owes a specific duty to the public to perform some act [or] administer some law for the public benefit which he is refusing or failing to perform or administer.” Kaplan v. Bowker, 333 Mass. 455, 460 (1956). A writ of mandamus orders a public officer to perform a specific duty theretofore ignored. See Simmons v. Clerk-Magistrate of Boston Div. of Housing Court Dep’t, 448 Mass. 57, 59-60 (2006). “Such relief is extraordinary,” Massachusetts Redemption Coalition, Inc. v. Secretary of Executive Branch of Envtl. Affairs, 68 Mass.App.Ct. 67, 69 (2007), and “not a matter of right but of sound judicial discretion,” Lu *674 theran Servs. Ass’n of New England, Inc. v. Metropolitan Dist. Comm’n, 397 Mass. 341, 345 (1986).
In accordance with the foregoing discussion, mandamus is not appropriate under the circumstances presented in this case. The plaintiffs have failed to show, as a matter of law, that the defendant has disregarded or neglected a clear-cut duty imposed by the Legislature. Under the plaintiffs’ interpretation of §3(d), DEP must impose declining, annual, aggregate emissions limits on certain sources or categories of sources of greenhouse gases. The determinations as to how many and which sources are to be regulated, and in what manner, however, are largely left to the discretion of the Department. Mandamus will ordinarily not issue where the subject agency has discretion in performing its duly, as the Department plainly does under §3(d), absent demonstrated abuse of such discretion. See Locator Servs. Group, Ltd., 443 Mass. at 856-57. “This court should be extremely wary of entering into controversies where we would find ourselves telling a coequal branch of government how to conduct its business.” Massachusetts Redemption Coalition, Inc., 68 Mass.App.Ct. at 70. Here, DEP has fulfilled the dictates of GWSA §3(d) under each of three separate and independently sufficient regulatoiy regimes. See ante.[10] Thus, because the plaintiffs have not shown that DEP has either abused its discretion or not reasonably met its obligations under §3(d) of the statute,[11] mandamus shall not issue.
CONCLUSION AND ORDER
The regulatoiy initiatives implemented by DEP may or may not prove effective in reducing the emission of greenhouse gases at the levels and/or in the time frames contemplated by the GWSA. If such initiatives are not successful, however, it will not be because the Department flouted the statutory directives of §3{d) by failing to promulgate reasonable emissions regulations. And in that event, it will either be for DEP to refine its greenhouse gas programs, or for the Legislature to draft a better law. It is not, however, for this Court to rewrite the statute that the plaintiffs wished the General Court had enacted, well-intentioned though such wishes might be. See Souza v. Registrar of Motor Vehicles, 426 Mass. 227, 232 (2012) (“[WIe are not at liberty to construe the statute in a manner that might advance its purpose but contravenes the actual language chosen by the Legislature”); DePierre v. United States, 131 S.Ct. 2225, 2233 (2011) (“That we may rue inartful legislative drafting . . . does not excuse us from the responsibility of construing a statute as faithfully as possible to its actual text”).
Both parties have sought a declaratory judgment in their favor, and agree that their respective submissions may be treated as cross motions for judgment on the pleadings. For the reasons stated above, the plaintiffs’ Motion for Judgment on the Pleadings is DENIED, and the defendant’s request that the Complaint be dismissed and a declaratory judgment entered in its favor is ALLOWED. A judgment shall enter declaring that the Massachusetts Department of Environmental Protection has substantially satisfied the requirements of Mass. G.L.c. 2IN, §3(d).

“Greenhouse gas” is defined under the Act to include “any chemical or physical substance that is emitted into the air and that the [DEP] may reasonably anticipate will cause or contribute to climate change including, but not limited to, carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons and sulfur hexafluoride.” G.L.c. 21N, §1.

 G.L.c. 21N, §1, the general definition section of the GWSA, provides that “department” refers to the Massachusetts Department of Environmental Protection, the defendant in this case.

 The petition also requested that the Department take additional actions independent of §3(d), such as preparing a plan to ensure that statewide fossil fuel carbon dioxide emissions are reduced by 6% per year. These companion requests are not implicated in the case at bar.

 The -within discussion of the SF6 regulations derives from 310 C.M.R. §772(l)-(9), unless otherwise noted.

 DEP amended the Program regulations in 2013.

 It seems even more implausible to construe §3(d) as inflexibly as the plaintiffs propose, in light of the arguably looser language the Legislature adopted in this particular provision of the statute (uiz., “. . . promulgate regulations establishing a desired level oí. . . emissions limits”).

 One might say that the ability to kill two birds with one stone hardly renders the second bird redundant to the hunt.

 Plaintiffs also argue that the purpose of the Program as promulgated by DEP is to increase state revenue, rather than to reduce greenhouse gas emissions. The Court does not agree. See 310 C.M.R. §7.70(l)(a) (stating explicitly that the Program’s purpose is “to stabilize and then reduce anthropogenic emissions of COo, a greenhouse gas from COa budget sources . . .”). That aside, the purpose or motivation of the agency’s regulation is, in the final analysis, irrelevant to whether or not it reasonably fulfills the requirements of § 3(d).

 Because §3(d) does not dictate that DEP promulgate regulations that provide for declining emissions limits in each and every category of greenhouse gas source, compliance by even one of the Department’s three regulatory programs would suffice to defeat the plaintiffs’ claim in this case.

 In their Complaint, the plaintiffs move for a general declaration that DEP failed to promulgate regulations under §3(d) before the statutory deadline of January 1, 2012. See St. 2008, c. 298, §16. Tbe Court expresses no opinion (and certainly intends no endorsement) respecting DEP’s course of conduct in this regard. However, this is neither a material fact in dispute in the case, nor does it present an issue of law requiring the Court’s determination. Although the Department itself acknowledges that it did not completely fulfill its §3(d) mandate until after the deadline (see Defendant’s Opposition, at 5 n.5), the matter has since been mooted insofar as concerns the plaintiffs’ prayers for declaratory and injunc-tive relief. Accordingly, the Court will abjure any ruling on this particular issue. See Lockhart v. Attorney Gen., 390 Mass. 780, 782-84 (1984) (observing that courts have discretion to avoid answering insubstantial questions, ruling on undisputed matters, and issuing judgments where a decision on such matters “would be of little or no practical guidance”).