DORIS A. GAW, individually and as administratrix, *vs.* CONTRIBUTORY RETIREMENT APPEAL BOARD & another.[1]

Suffolk.    January 19, 1976. — April 16, 1976.

Present: KEVILLE, GRANT, & ARMSTRONG, JJ.

*Statute,* Construction.  *Public   Officer.   Retirement.   Words,* "Employed as."

The manager of a municipal light department was not a supervisor of linemen within the meaning of G. L. c. 32, § 3(2)(g), even though he engaged from time to time in the direct supervision of line crews. [251-253]
Legislative history of G. L. c. 32, § 3(2)(g).  [253-256]

BILL IN EQUITY filed in the Superior Court on June 25, 1973.
The case was heard by *Moriarty,* J.
*Maurice J. Ferriter* for the plaintiff.
*Paul A. Good,* Assistant Attorney General, for the Contributory Retirement Appeal Board.

KEVILLE, J.    This is a bill for judicial review[2] of a decision of the Contributory Retirement Appeal Board (appeal board) classifying for retirement purposes, under G. L. c. 32, § 3(2)(g), the plaintiff's late husband (Gaw), who had been, until his death, manager of the Reading Municipal Light Department. The Reading contributory retirement board (local board), whose prior decision re-

---

[1] Reading contributory retirement board.

[2] General Laws c. 30A, § 14, as in effect prior to July 1, 1974.

garding Gaw's classification was upheld by the appeal board, intervened as a party defendant. The plaintiff appeals from a judgment of the Superior Court entered after July 1, 1974 (Mass.R.Civ.P. 1A, 365 Mass. 731 [1974]), affirming the decision of the appeal board.

The case turns on the proper construction of that portion of G. L. c. 32, § 3 (2) (*g*), as amended through St. 1970, c. 662, which directed retirement boards to classify members of their respective retirement systems in one of four numbered "groups." The question is whether Gaw should have been classified in Group 1, as decided by the two boards and the judge, or in Group 4, as contended by the plaintiff. Section 3 (2) (*g*), as so amended, provided that Group 1 should consist of "[*o*]*fficials* and general employees including clerical, administrative and technical workers, laborers, mechanics *and all others not otherwise classified*" (emphasis supplied) and that Group 4 should include "employees of a municipal gas or electric plant who are employed as linemen, electric switchboard operators, electric maintenance men, steam engineers, boiler operators, firemen, oilers, mechanical maintenance men and *supervisors of said employees*" (emphasis supplied). The importance of the dispute lies in the fact that persons classified in Group 4 attain maximum retirement allowances (see *Gallagher* v. *Contributory Retirement Appeal Bd.*, *ante,* 1, 4, fn. 8 [1976]) at an earlier age than those classified in Group 1 (G. L. c. 32, § 5[2] [*a*], as appearing in St. 1967, c. 826, § 6)[3] and the fact that the plaintiff would be entitled to a correspondingly greater survivor's allowance if Gaw were so classified. G. L. c. 32, § 12 (2), as amended through St. 1968, c. 600, § 2.

The case is before us on the decision (including findings of fact) of the appeal board, a transcript of the testimony heard by the appeal board, various exhibits introduced in evidence before it, and findings of the judge. The facts as found by the appeal board and the judge are not in dispute

---

[3] Gaw was forty-nine years of age when he died on December 24, 1971.

and those facts, together with others drawn from the evidence, may be summarized as follows.

There were sixty-two persons employed by the Reading Municipal Light Department. According to the official job specifications, there were several supervisory positions in the department. The highest ranking of those positions was that of manager, the position held by Gaw. "The manager [d]irect[ed] all activities of the [d]epartment, [and] perform[ed] duties as prescribed by law."[4] Under the manager was the general line foreman,[5] who was responsible for "[s]upervision of overhead and underground line crews" and had "direct charge of construction, maintenance, operation and stores." Subordinate to the general line foreman was the line truck foreman or foremen, who had "charge of [a] line crew" and "work[ed] with men under order of [the] [g]eneral [l]ine [f]oreman."[6] Finally, the specifications refer to several classes of linemen, including linemen first class who, at least on occasion, super-

---

[4] Under G. L. c. 164, § 56 (as amended through St. 1958, c. 160), Gaw served under the direction and control of the Reading Municipal Light Board and had "full charge of the operation and management of the plant, the manufacture and distribution of . . . electricity, the purchase of supplies, the employment of attorneys and of agents and servants, the method, time, price, quantity and quality of the supply, the collection of bills, and the keeping of accounts." See *Commonwealth* v. *Oliver,* 342 Mass. 82, 84-85 (1961); *Municipal Light Commn. of Peabody* v. *Peabody,* 348 Mass. 266, 267-268 (1964).

[5] The written specifications in evidence are apparently incomplete. Other evidence before the appeal board indicates that the department also had an assistant manager, who presumably ranked between the manager and the general line foreman. Moreover, the specifications which were introduced include the positions of superintendent of distribution and construction co-ordinator, each of which was assigned duties which suggest that its holder had supervisory authority over the general line foreman. But no finding was made as to the status of any of those three positions, and the evidence relative thereto is not sufficiently clear to warrant our supplying such a finding. We therefore omit those positions from consideration in determining the organizational structure of the department.

[6] The testimony indicates that the department also had positions entitled substation supervisor, line superintendent and underground supervisor. Since we cannot be sure of their exact status in the organization of the department, we do not consider them.

vised other linemen. On paper, then, there were several echelons of supervisory personnel interposed between the manager and the members of the line crews in the field. See *Maddocks* v. *Contributory Retirement Appeal Bd.* 369 Mass. 488, 495 (1976).

On the other hand, when Gaw served as manager of the department, he personally engaged in the direct supervision of line crews on a number of occasions, particularly during emergencies. But those activities were sporadic and secondary to the performance of his managerial functions as prescribed by the specifications and by statute (see fn. 4).

The appeal board concluded, and the judge agreed, on the basis of those facts, that Gaw was not among the "employees of ... [the Reading Municipal Light Department] who ... [were] employed as linemen [and the like] ... and supervisors of said employees" contemplated for inclusion in Group 4 by G. L. c. 32, § 3(2) (*g*). The plaintiff contends that it is irrelevant for purposes of the statute whether Gaw performed the field work sporadically or regularly and whether the performance of such work was a secondary or primary function. The crucial point, she asserts, is that he did perform such work and that its performance, though infrequent, qualified him for inclusion in Group 4. Our examination of § 3(2) (*g*) in accordance with standard principles of statutory construction (see *Board of Education* v. *Assessor of Worcester*, 368 Mass. 511, 513 [1975], and cases cited; *Prudential Ins. Co.* v. *Boston*, 369 Mass. 542, 546-547 [1976]) persuades us that the plaintiff's interpretation is not correct and that the judgment must be affirmed.

As originally created Group 4 included only "[m]embers of police and fire departments not classified in Group 1." See St. 1967, c. 826, § 3. Its purpose, as explained in the special report of the Retirement Law Commission recommending it (1967 House Doc. No. 5316), was to encourage earlier retirement of police officers and firemen in order to make room for younger men better able to perform the arduous and hazardous tasks expected of such employees.

*Id.* at 16-21. Group 4 was thereafter enlarged by successive amendments to include the municipal light plant employees described in the clause at issue here (St. 1970, c. 662, § 2) and other classes of employees (St. 1968, c. 542, § 2; St. 1968, c. 650, § 2; St. 1969, c. 816).[7] It is fair to assume that the additions were made for reasons similar to those underlying the creation of Group 4 in its original form. Apart from the clause at issue in the present case, we note that the Legislature has consistently described employees falling within Group 4 by naming their positions or titles rather than by describing the type of work they perform. See fn. 7. Subject to two exceptions, the same is true of those included in Group 2,[8] who also enjoy an advantage-

---

[7] At the time of Gaw's death Group 4 included the following: "Members of police and fire departments not classified in *Group 1,* employees whose regular compensation is paid by the United States from funds allocated to the Massachusetts National Guard and who are regularly and permanently employed under the control of the military department of the commonwealth and whose duties in such employment require substantially all normal working hours and whose continued employment is based upon federal recognition in the Massachusetts National Guard, employees of a municipal gas or electric plant who are employed as linemen, electric switchboard operators, electric maintenance men, steam engineers, boiler operators, firemen, oilers, mechanical maintenance men and supervisors of said employees, and employees of the department of correction who are employed at any correctional institution or prison camp under the control of said department and who hold the position of correction officer, female correction officer, industrial instructor, recreation officer, assistant industrial shop manager, industrial shop manager, assistant to the supervisor of industries, supervisor of industries, senior correction officer, senior female correction officer, supervising correction officer, supervising female correction officer, prison camp officer, senior prison camp officer, supervising prison camp officer or assistant deputy superintendent." G. L. c. 32, § 3(2) (*g*), as amended through St. 1970, c. 662, § 2.

[8] Group 2 of G. L. c. 32, § 3(2) (*g*), as amended through St. 1970, c. 662, § 1, included the following: "Members of the division of state police appointed under the provisions of section six of chapter twenty-two, members of the police force of the metropolitan district commission, capitol police, public works building police, permanent watershed guards and permanent park police, employees of the Massachusetts Port Authority, comprising guards, guard sergeants, head guard and chief of waterfront police, conservation officers paid as such, district fire wardens, coastal wardens in the department of natural resources, officials and employees of the registry of motor vehicles having police powers, officials and employees of the department of public safety hav-

ous retirement status (see G. L. c. 32, § 5[2] [a], as appearing in St. 1967, c. 826, § 6) and many of whom have from time to time been transferred to Group 4 (see e.g., St. 1967, c. 826, §§ 2, 3; St. 1968, c. 542, §§ 1, 2; St. 1968, c. 650, §§ 1, 2; St. 1970, c. 662, §§ 1, 2). Those exceptions, which appear in the last two classes of employees enumerated in Group 2 as reproduced in the margin (see fn. 8), are county and Commonwealth employees "whose regular and major duties *require* them" (emphasis supplied) to perform certain tasks of a hazardous nature. But the difference between the clauses referred to and the remaining language of Group 2 is somewhat superficial, as one's eligibility for classification in Group 2 under the two clauses may depend largely on the job description of his position. See *Maddocks* v. *Contributory Retirement Appeal Bd.* 369 Mass. at 495-497. Group 3, the remaining retirement classification group, which includes a single class of employees, certain "[o]fficers and inspectors of the division of state police" for whom special provision is made,[9] is also framed in terms of positions held rather than work performed.

Given that consistent pattern of legislative draftsmanship in characterizing those eligible under Groups 2, 3 and 4, we would expect to find, as we do, a similar approach in the language of the clause in Group 4 pertaining to em-

---

ing police powers, employees of a municipal fire or police department who are employed as signal operators or signal maintenance repairmen, ambulance attendants of a municipal fire department who are required to respond to fires and perform duties assigned to them, employees of a city or town who are employed as licensed electricians, employees of the Massachusetts Port Authority at the General Edward Lawrence Logan International Airport, comprising permanent crash crewmen, fire control man, assistant fire control men and *employees of any county, regardless of any official classification, whose regular and major duties require them to have the care, custody, instruction or other supervision of prisoners, and employees of the commonwealth or of any county whose regular and major duties require them to have the care, custody, instruction or other supervision of parolees or insane persons or of defective delinquents*" (emphasis supplied). The language emphasized represents the two exceptions referred to in the text.

[9] General Laws c. 32, § 3(2)(g), *Group 3,* as inserted by St. 1958, c. 321, § 3.

ployees of municipal gas and electric plants. That clause does not by its terms apply to employees who *serve* as linemen and the like or as their supervisors, but rather to "employees" of such a plant "who are *employed*" in those capacities (emphasis supplied). Again, the test for eligibility is largely the employee's title or job description. To construe the clause otherwise would be to treat the word "employed" as surplusage. Compare *Miller* v. *Assessors of Wenham,* 350 Mass. 629, 632 (1966).

Our examination of the legislative history of that clause (see *Gallagher* v. *Contributory Retirement Appeal Bd., ante,* 1, 6-9 [1976]) supports the conclusion that a restrictive interpretation was intended. While the clause was inserted in Group 4 by St. 1970, c. 662, that was accomplished simply by shifting it, word for word, from Group 2, and the legislative history underlying the shift is not instructive. The events leading to the insertion of the clause in Group 2 by St. 1957, c. 255, however, are revealing. The bill on which it was based, as originally filed, applied to "employees of a municipal gas and electric plant who are engaged in work of a dangerous nature." 1957 House Doc. No. 2140. Had the clause been enacted in that form, the interpretation urged by the plaintiff would have much to support it. But the original formulation was rejected by the Senate, where the present wording, including the insertion of the phrase "employed as," was adopted as a floor amendment. 1957 Senate Journal, at 563, 589. See fn. 7. It therefore appears that the Legislature regarded the phrase as having some significance. Compare *Commonwealth* v. *Gove,* 366 Mass. 351, 355, fn. 2 (1974). Contrast *Commonwealth* v. *Kraatz,* 2 Mass. App. Ct. 196, 201 (1974).

The ultimate question is whether Gaw, as manager of the Reading Municipal Light Plant, was "employed as" a supervisor of the types of personnel enumerated in § 3 (2) (*g*), *Group 4.* The appeal board answered that question in the negative. To the extent that its answer was a finding of fact, it was supported by substantial evidence

and must stand. Compare *Maddocks* v. *Contributory Retirement Appeal Bd.* 369 Mass. at 495-496. To the extent that it was a ruling of law, we agree with the judge that it was correct.

While the words "supervise" and "manage" are commonly used interchangeably (see *Fluet* v. *McCabe,* 299 Mass. 173, 179 [1938]; Webster's Third New Intl. Dictionary, at 1372 [1971]), we believe that the Legislature intended the clause in question to refer only to the *immediate* supervisors of linemen and the like. An intention to exclude managers from the scope of the word "supervisors" may, at least in the case of most electric light departments, be inferred from the use of the phrase *"employees* of a municipal ... electric plant" (emphasis supplied) to describe the class of persons covered. That phrase is at best inappropriate to describe the manager of an entire plant whose functions include the hiring of its employees. See fn. 4. Such an inference is also justified by the omission of the word "manager" from the recitation of those included as employees. The manager of a municipal electric plant is a public officer (*Commonwealth* v. *Oliver,* 342 Mass. 82, 84 [1961]) whose position is created by statute (see fn. 4), and the Legislature, which is presumed to have been aware of those facts, could be expected to have made specific reference to the position if its inclusion had been intended. Compare *Prudential Ins. Co.* v. *Boston,* 369 Mass. 542, 546 (1976).

It is true that there may be instances in which an electric plant is so small and has so few employees that its manager is required to serve regularly as the immediate supervisor of its field crews. But even assuming a manager of such a plant to be a "supervisor" within the meaning of Group 4, the interposition of various levels of authority between the manager of the Reading Municipal Light Department and its crews excluded Gaw from that category. The fact that Gaw supervised field work from time to time is not decisive. It is the function of this court on review to construe the statute as written and not to engage in ju-

dicial legislation by extending its application to events or contingencies for which no provision has been made. *Id.* at 546-547.

*Judgment affirmed.*