NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12326


LUIS S. SPENCER  vs.  CIVIL SERVICE COMMISSION & another.[1]



Suffolk.     December 4, 2017. - March 27, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Cypher, & Kafker, JJ.


Commissioner of Correction.  Public Employment, Resignation.
     Civil Service, Decision of Civil Service Commission,
     Termination of employment, Findings by commission.
     Jurisdiction, Civil Service Commission.  Words,
     "Termination of his service."




     Civil action commenced in the Superior Court Department on
December 8, 2015.

     The case was heard by Robert N. Tochka, J., on motions for
judgment on the pleadings.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     David A. Russcol (Monica R. Shah also present) for the
plaintiff.
     Jesse M. Boodoo, Assistant Attorney General, for the
defendants.

---

[1] Department of Correction.

KAFKER, J. The issue presented is whether Luis S. Spencer, who resigned under pressure as Commissioner of Correction (commissioner) in the midst of a public investigation of his oversight of Bridgewater State Hospital, has a right, pursuant to G. L. c. 30, § 46D, to revert to a tenured civil service correction officer II position he last held in 1992. Upon his resignation and the denial of his request to revert, Spencer filed an appeal with the Civil Service Commission (commission). The commission concluded that the right to revert to a civil service position applies only to involuntary terminations, not voluntary resignations, and because Spencer voluntarily resigned, no "termination of his service" had occurred within the meaning of G. L. c. 30, § 46D. Spencer brought a complaint against the commission and the Department of Correction (department), seeking judicial review of the commission's decision. A judge in the Superior Court affirmed the commission's decision. Spencer appealed, and we transferred his appeal to this court on our own motion. We conclude that § 46D does not provide a right to revert in these circumstances and that the commission's interpretation of this ambiguous statutory language is reasonable, as it applies the same rules for reversion to managers as it does to all other civil service employees and avoids the type of manipulation of retirement

benefits at issue here.  Accordingly, we affirm the decision of the commission.

1.  Background.  a.  Statutory framework.  Under the Commonwealth's civil service statutory scheme, a number of rank and file and lower level management positions, particularly in public safety, are covered by the civil service laws.  A tenured civil service employee cannot be demoted, discharged, or suspended from such positions without just cause.  See G. L. c. 31, §§ 1, 41.  Rather, the appointing authority must follow specific procedures to terminate a tenured civil service employee, and the employee is entitled to a full hearing before such termination takes effect.  G. L. c. 31, § 41.  Where a tenured civil service employee is terminated for "lack of work or lack of money or abolition of positions," the employee may opt to be demoted to his or her next lowest title, instead of being terminated, "if in such next lower title or titles there is an employee junior to him in length of service."  See G. L. c. 31, § 39.  This practice is known as "bumping."  See Andrews v. Civil Serv. Comm'n, 446 Mass. 611, 619 (2006).  By contrast, if an employee resigns, there is no provision granting him or her the right to request his or her prior position.  See G. L. c. 31, § 39.

The civil service laws do not apply to middle and upper level management positions in public service.  See G. L. c. 30,

§§ 46D, 46E, 46F.  However, under G. L. c. 30, § 46D, a middle

or upper level manager may revert or "bump" back to the tenured

civil service position from which he or she has been promoted

upon "termination of his [or her] service."[2]  For middle and

upper level managers who were "terminated for cause," the right

to revert is more limited and must be determined by a hearing

---

[2] General Laws c. 30, § 46D, provides:

"Whenever it is deemed practicable in the judgment of the appointing authority and with concurrence with the secretary, where applicable, appointments to positions allocated to job groups M-I through M-IV, inclusive, of the management salary schedule shall be made by promoting employees of the [C]ommonwealth serving in positions assigned to the general salary schedule; and appointments to positions allocated to job groups M-V through M-XII, inclusive, in the management salary schedule shall be made by promoting managers of the [C]ommonwealth serving in positions allocated to job groups M-I through M-IV, inclusive, in the management salary schedule.

"In every instance of a manager or employee so promoted from a position classified under [G. L. c. 31] or from a position in which at the time of promotion he shall have tenure by reason of [G. L. c. 30, § 9A], upon termination of his service in the position to which he was so promoted, the manager or employee shall, if he so requests, be restored to the position from which he shall have been promoted, or to a position in the same [S]tate agency, without impairment of his civil service status or his tenure by reason of said [§ 9A] or loss of the seniority, retirement and other rights to which uninterrupted service in such position would have entitled him; provided, however, that if his service in the position to which he was promoted shall have been terminated for cause, his right to be restored shall be determined by the civil service commission, in accordance with the standards applied by said commissioner in administering [G. L. c. 31]."

before the commission, in accordance with the standards set out in G. L. c. 31.  See G. L. c. 30, § 46D.

   b.  Facts.  We summarize the facts as recited in the commission's statement of undisputed facts.  Spencer was first appointed to a civil service position in 1980 when he became a Correction Officer I (CO-I).  In 1991, he was appointed captain, the first in a string of appointments to nontenured management positions.  In 1992, he received a one-day permanent appointment to Correction Officer II (CO-II), the highest tenured civil service position he would ever hold.  He was granted a permanent leave of absence from this position[3] and continued up the ranks of nontenured management positions, being appointed director of security in 1993, deputy administrator in 1995, superintendent in 1997, and assistant deputy commissioner in 2008.

   In 2011, Spencer was appointed as commissioner by the Secretary of the Executive Office of Public Safety & Security (Secretary).  His appointment was approved by the Governor.  In 2014, Spencer came under intense public scrutiny for his handling of the investigation into an inmate's death at Bridgewater State Hospital.  In March, 2014, Spencer received a written letter of reprimand from the Secretary for his failure

_____

   [3] Although Spencer's appointment to Correction Officer II (CO-II) was only for one day, his request for a permanent leave of absence from that position was not officially granted until 2003, over eleven years after he left the position.

to track the results of the investigation vigilantly.  The letter ordered Spencer to "revisit the investigation and place the officers involved on administrative leave, pending renewed inquiry into the matter."

In July, 2014, details emerged of another incident at Bridgewater State Hospital that took place in May, 2014, this time involving the alleged abuse of a mental health patient by a correction officer.  On July 22, 2014, the Secretary spoke with Spencer by telephone, and informed him that the Governor had requested Spencer's resignation.  The Secretary requested that Spencer send her two letters of resignation, one dated July 23, 2014, and one dated July 28, 2014, in the event that it took a few days for the department to transition to a new commissioner.

On July 23, Spencer contacted the acting assistant deputy commissioner for human resources.  Spencer asked her to confirm department practice on reverting to a prior civil service position, and to send the sample language for requesting to revert.  After receiving the sample language, Spencer sent the Secretary two copies of his resignation letter, one dated July 23, 2014, and the other dated July 28, 2014.  The resignation letter highlighted Spencer's accomplishments as commissioner, and concluded with the following statement:  "I ask that you respectfully accept my resignation from my appointed position as the [commissioner] and accept my request to revert back to my

last uniformed position, which was [c]aptain for the [department]."[4]  Later the same day, Spencer also sent the Secretary an additional letter specifically requesting to revert to his captain position and a second, amended reversion letter, with additional salary information.  Spencer stated in his reversion letter that "[i]f this request is approved . . . I would then be able to retire within a year at [eighty per cent]. If I retire from the [department] on this date I would only be eligible for 50.4 [per cent]."  Spencer also sent the Secretary a page from the "Benefit Guide for the Massachusetts Employee's Retirement System," and highlighted the criteria for "certain correction officers" to be classified in "Group Four" for retirement purposes.  One such requirement is that the employee be "actively performing the duties of the [Group Four] position" for twelve consecutive months immediately preceding retirement. If Spencer retired as commissioner, he would be classified in the less lucrative "Group One."

---

[4] Spencer's prior position as CO-II, not captain, was the last permanent civil service position he held.  If he was permitted to revert to a position in which he previously had tenure, he would be reverted to his CO-II position, which he last held twenty-two years prior, in 1992.  The statute does provide that "the manager or employee shall, if he so requests, be restored to the position from which he shall have been promoted, or to a position in the same [S]tate agency."  G. L. c. 30, § 46D.  However, the Civil Service Commission (commission) has limited the entitlement to reversion to apply only to prior permanent positions, not any other prior position. O'Donnell v. Registry of Motor Vehicles, 22 Mass. Civ. Serv. Rep. 638, 642 (2009).

The next day, the Secretary spoke with Spencer about his resignation by telephone. The Secretary said that the Governor would accept Spencer's resignation only if it was unconditional, and that the terms of the resignation would not be negotiated. Therefore, Spencer could not include the request to revert in his resignation letter. According to Spencer, the Secretary told him that "if [he] did not allow that request to be removed, [his] employment would be terminated." The Secretary also indicated to Spencer that his request to revert from commissioner to a correction officer was "unprecedented" and voiced her concerns about his continued presence in the department. She did tell him that "she would consider [his] request to be reinstated."

After their conversation, the Secretary sent Spencer a revised copy of Spencer's resignation letter. The letter was identical to the resignation letter Spencer had sent the day before, except that the Secretary had removed the request to revert. Spencer acknowledged receipt of the revised resignation letter. Internal department paperwork stated that the reason for Spencer's termination was "Resigned from Mgmt position 7/24/14."

Four days later, the Secretary verbally informed Spencer that his request to revert was denied. On July 30, 2014, Spencer sent a new request for reversion to the acting assistant

deputy commissioner.  On August 7, 2014, Spencer was informed that this request had been denied.  Spencer sent a second request for reversion to the acting assistant deputy commissioner that same day.  In a letter dated August 15, 2014, Spencer was informed his second request had also been denied.

On August 28, 2014, Spencer filed an appeal with the commission.  The department filed a motion to dismiss, and the commission permitted both parties to submit evidence as to the factual issues.[5]  After conducting a hearing on the motion, the commission granted the department's motion and dismissed the case.  Spencer thereafter sought judicial review of the commission's decision.

3.  Discussion.  We may set aside the commission's decision only if "'the substantial rights of any party may have been prejudiced' [because the commission decision] is based on an error of law, unsupported by substantial evidence, or otherwise not in accordance with the law." Police Dep't of Boston v. Kavaleski, 463 Mass. 680, 689 (2012) (Kavaleski), quoting G. L. c. 30A, § 14 (7).  The party appealing bears a heavy burden because "we give 'due weight to the experience, technical

_____

[5] Motions to dismiss before the commission differ somewhat from such motions under Massachusetts Rules of Civil Procedure, as they may be made after the presentation of evidence.  Compare 801 Code Mass. Regs. § 1.01(7)(g) (1998) with Mass. R. Civ. P. 12, 365 Mass. 754 (1974).

competence, and specialized knowledge of the commission.'" Kavaleski, supra, quoting G. L. c. 30A, § 14 (7).

a. Right to reversion. The primary issue raised on appeal is the meaning of "termination of his service" within G. L. c. 30, § 46D. Spencer argues that his resignation was a "termination of his service" under the statute. He claims that "termination of his service" applies to voluntary as well as involuntary separations from employment, and that even if it applied only to involuntary separations, his resignation was coerced by the Governor and the Secretary. The commission disagreed, finding "termination of his service" does not apply to voluntary resignations, regardless of the reasons for resigning. Spencer contends that the commission's interpretation of G. L. c. 30, § 46D, is owed no substantial deference because the commission is responsible only for administering the civil service laws, not G. L. c. 30.

i. Meaning of termination of his service. "Our primary duty in interpreting a statute is 'to effectuate the intent of the Legislature in enacting it.'" Campatelli v. Chief Justice of the Trial Court, 468 Mass. 455, 464 (2014), quoting Water Dep't of Fairhaven v. Department of Envtl. Protection, 455 Mass. 740, 744 (2010). "Ordinarily, if the language of a statute is plain and unambiguous it is conclusive as to legislative intent. . . . However, time and again we have stated that we

should not accept the literal meaning of the words of a statute without regard for that statute's purpose and history" (citations omitted).  Sterilite Corp. v. Continental Cas. Co., 397 Mass. 837, 839 (1986).  Moreover, "substantial deference" is owed "to a reasonable interpretation of a statute by the administrative agency charged with its administration [and] enforcement."  Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006).  However, "[a]n incorrect interpretation of a statute . . . is not entitled to deference."  Kszepka's Case, 408 Mass. 843, 847 (1990).

"[T]ermination of his service" is not a well-understood term of art such as "termination for cause."  While at least ten other statutes contain very similar wording,[6] it appears that we have not previously been tasked with interpreting the meaning of "termination of his service" in any of those provisions.  Even when read in context, the plain meaning of "termination of his

---

[6] See G. L. c. 6, § 75 (Massachusetts Rehabilitation Commission); G. L. c. 6A, § 7 (Secretaries of executive offices); G. L. c. 6C, § 39 (administrative offices of division of highways); G. L. c. 7, § 4D (Executive Office of Administration and Finance); G. L. c. 7, § 4J (Human Resources Division); G. L. c. 10, § 26 (director of the State lottery); G. L. c. 14, § 4 (Department of Revenue); G. L. c. 19A, § 10 (Department of Elder Affairs); G. L. c. 21A, § 6 (Executive Office of Energy and Environmental Affairs); G. L. c. 25A, § 4 (Division of Energy Resources).  In very different contexts see also G. L. c. 30, § 32 (annual reports filed by State officers); G. L. c. 32, § 10 (retirement allowance for civil service employees); G. L. c. 41, § 127 (tenure for certain appointed offices in cities, towns and districts); G. L. c. 151D, § 13 (vested benefits).

service" in G. L. c. 30, § 46D, remains somewhat ambiguous. The term is not expressly defined in the statute. The civil service statute, G. L. c. 31, which is cross-referenced in § 46D, also does not employ or define this exact term, although it does distinguish between involuntary discharges and voluntary resignations. See G. L. c. 31, § 1 (defining "discharge" as "permanent, involuntary separation," and "resignation" as "permanent voluntary separation"). Although the phrase "termination of his service" is used only once in § 46D, there is a subsequent reference to employees "terminated for cause." As terminations for cause are a subset of involuntary terminations, the use of the phrase "terminated for cause" in the same paragraph supports an interpretation that the reference to "termination of his service" is similarly limited to involuntary separations from employment. See Booma v. Bigelow-Sanford Carpet Co., 330 Mass. 79, 82 (1953) ("It is a familiar canon of construction, that when similar words are used in different parts of a statute, the meaning is presumed to be the same throughout"); Eaton v. Federal Nat'l Mtge. Ass'n, 462 Mass. 569, 583 (2012). For further guidance, however, we turn to the legislative history and purpose. See Sterilite Corp., 397 Mass. at 839.

Where, as here, the statutory language remains ambiguous, "we consider 'the cause of its enactment, the mischief or

imperfection to be remedied and the main object to be accomplished, [such that] the purpose of its framers maybe effectuated.'" Water Dep't of Fairhaven, 455 Mass. at 744 (2010), quoting DiFiore v. American Airlines, Inc., 454 Mass. 486, 490 (2009). Prior to 1981, middle and upper managers were eligible to receive civil service status and tenure. See 1981 House Doc. No. 6279 at 2. However, in 1981, the Governor proposed a comprehensive overhaul of the Massachusetts civil service system to the Legislature, accompanied by a letter and a document explaining the details of the legislation. Id. at 1. The legislation accomplished multiple, related purposes. Notably, it removed upper and middle level managers from the civil service system and increased their pay. See id. at 1-2; St. 1981, c. 699, § 73. It thereby provided much greater flexibility in the hiring, promotion, and removal of managers. See 1981 House Doc. No. 6279. In his letter accompanying the proposed bill, the Governor stated: "[T]he implementation of this plan is essential if we are to encourage more responsibility and accountability in our managers and if we are to motivate such managers to assist in the achievement of the state's objectives in a more economical and efficient manner." Id. at 1. The summary of the legislation further indicated that a modern personnel system required that "managers be recognized as such -- a group separate and apart from employees; a group,

in fact, responsible for the supervision of those same employees." Id. at 4.

The legislation also recognized the "demoralizing" effect of having employees face limited opportunities for advancement. Id. at 17. Accordingly, it strongly encouraged the promotion of lower level managers into middle and upper level management positions. Id. See G. L. c. 30, § 46D ("Whenever it is deemed practicable . . . appointments to positions allocated to job groups M-V through M-XII . . . shall be made by promoting managers of the [C]ommonwealth serving in positions allocated to job groups M-I through M-IV"). Because lower level managers would lose their civil service status if promoted to a middle or upper level management position, the bill further provided limited protections against the termination of service of anyone so promoted. 1981 House Doc. No. 6279 at 18. According to the Governor, "[A]nyone promoted from such a position to a middle or upper level position could retain such status or tenure and could return to the position from which he or she was promoted." Id. This would incentivize lower level managers to seek promotion, despite the lack of civil service protections for middle and upper management, by ensuring that, once promoted, they still had a means of returning to their prior civil service position if their service in a management position was terminated. In essence, managers who had been promoted from the

ranks of civil service employees retained the right to bump back to their former positions. This right to bump back or revert is, as explained above, an important component of the civil service laws. See G. L. c. 31, § 39.

We also look to the commission's interpretation of the statutory language. See Commerce Ins. Co., 447 Mass. at 481. Although the commission is not explicitly charged with administering G. L. c. 30, this chapter is integrated into the civil service laws that the commission is required to interpret and enforce. Contrast Springfield v. Civil Serv. Comm'n, 469 Mass. 370, 380 (2014) (no special deference owed to commission's interpretation of G. L. c. 268A, § 25, which makes no mention of commission and relates to criminal misconduct). The entire system must function in a coherent manner as manager reversion rights ripple through the entire system, directly impacting the rights of other civil service employees, who may be required to bump each other. Cf. Malloch v. Hanover, 472 Mass. 783, 791 (2015) ("We interpret separate sections of statutes as a whole, to produce internal consistency . . . and to give a 'rational and workable effect'" [citations omitted]). Additionally, G. L. c. 30, § 46D, specifically tasks the commission with administering the provision's for cause hearings. Accordingly, the commission's interpretation of the statute warrants some deference if it is reasonable.

The commission recognized that this case involves an "unprecedented" request from a former commissioner, the highest ranking position in the organization, to be reinstated to his last "uniformed" position in the department after resigning his post at the request of the Governor.  As the commission explained, it has a long-standing practice of not treating civil service resignations as terminations, and § 46D "rationally must be construed to preserve, not abolish, the traditional, well-recognized distinction in civil service law between involuntary 'termination' and voluntary resignation,' with involuntary termination . . . being the sole trigger for any 'right' of an employee to revert to a lower-level tenured position."

The commission's consistent enforcement of this distinction provides important protections for all employees, those bumping others as well as those being bumped.  The system is designed to provide a priority of protection against involuntary loss of employment, rather than to allow one set of employees to displace another at will.  The commission's adoption of this important principle in this context is persuasive.  To do otherwise would create an unfair advantage for upper level managers over lower level managers and civil service employees. It would extend the right to "bump" another civil service employee upon voluntary resignation, whereas under the civil service laws tenured civil service employees may only "bump"

into a lower level position upon involuntary separation from service. See G. L. c. 31, § 39; Andrews, 446 Mass. at 612 n.3, 619.

The commission's interpretation also is fully consistent with the statutory language and purpose. The references to termination in § 46D, as explained above, appear to refer to involuntary loss of employment. The statutory purpose also suggests that managerial bumping rights be limited to those who have been terminated from their managerial positions rather than those who have decided for other reasons, such as pension enhancement, to return voluntarily to the civil service ranks, and thereby potentially force the involuntary termination of another employee. The statutory scheme recognizes that promoted managers are much more vulnerable to terminations, including terminations for reasons related to changes in administrations after elections, and § 46D was designed to protect such managers from job loss for those reasons. There is nothing in the legislative history suggesting that it also was intended to allow managers who were not terminated to use reversion rights to combine the benefits of both their managerial position and their former civil service position to the detriment of rank and file employees.

Spencer places heavy reliance on the fact that the department previously allowed other upper level managers to

revert to their prior civil service position upon resignation. Based on the record before us, there were indeed a number of voluntary resignations in the department wherein employees were allowed to resign and return to their former positions. To the extent that we can determine the reasons for these requests from the record, it appears that the employees were permitted to revert to their former positions shortly before retirement in order to retire from a position that would place them in Group 4.

Retirement benefits for public employees are calculated on the basis of whichever "Group" an employee belongs to when he or she retires. See G. L. c. 32, § 3 (2) (g). As commissioner, Spencer belonged to Group 1. By contrast, certain uniformed positions, including CO-II, fall within Group 4. Group 4 employees receive higher pensions at an earlier age than Group 1 because such positions entail significantly more hazardous duties than positions in Group 1. Cf. Pysz v. Contributory Retirement Appeal Bd., 403 Mass. 514, 518 (1988). "Providing early retirement incentive to employees with hazardous duties . . . has the effect of making room for younger employees better able to perform that type of work." Id. See Gaw v. Contributory Retirement Appeal Bd., 4 Mass. App. Ct. 250, 253-254 (1976). Attaining Group 4 status, and the greater

retirement benefits it provides, was expressly referenced in Spencer's communications with the Secretary.

Although we may consider departmental practice, we turn to the statutory language, legislative history, and administrative interpretation to determine if there is a statutory basis for the practice. See Sterilite Corp., 397 Mass. at 839. Our own views are informed by the thoughtful discussion of this practice in the commission's decision. As explained by the commission, prior to 2012, a practice known as "King for a Day" was commonly employed to allow employees to revert to a uniformed position for a single day to allow them to retire in Group 4. Effective in 2012, the State pension law was changed to prevent these single-day reversions, but even before this legislative reform, such contrived or "sham" retirements had been deemed illegal. See Pysz, 403 Mass. at 518; St. 2011, c. 176, § 8. Yet, as the commission further explained:

> "There is no dispute that, over the years, [the department] has consented to similar requests of a significant number of [department] managers, all below the [department] [c]ommissioner level, to be demoted to 'uniformed-level' positions immediately prior to retirement solely to qualify for such an enhanced pension that the law arguably allowed. Assuming the law still permits the practice, absent further legislative changes, the [c]ommission has no power to prevent [the department] (or others) from voluntarily choosing to enable its top managers to accept demotions to lower level positions (tenured or not) and take advantage of the law, although the only motivation is to qualify the managers for enhanced Group 4 benefits. It is another matter, however, to ask the [c]ommission to put its imprimatur on such a

> questionable practice by asking it . . . to mandate that result in this, and, by implication, in every other similar case, as a matter of law and public policy."

We agree with the commission. Although the department may have a practice of permitting upper level managers to resign and revert to their prior civil service positions for public pension benefits, this does not mean that upper level managers have a right to such reversion. We conclude that G. L. c. 30, § 46D, was not designed to permit a high-level manager to voluntarily resign and revert, particularly when he does so for the purpose of attaining enhanced retirement benefits designed for a hazardous employment position he has not occupied in twenty-five years. Instead, § 46D is designed to provide managers involuntarily terminated the right to revert to continue their public service.

ii. _Voluntariness of Spencer's resignation_. Spencer separately argues that his resignation was involuntary, because he was misled or compelled to resign under the threat of termination. As we have previously held in the context of employee benefits under G. L. c. 41, § 111F, an employee's resignation is voluntary absent a showing of fraud, coercion, or duress. See Jones v. Wayland, 374 Mass. 249, 259-260 (1978), S.C., 380 Mass. 110 (1980). Neither contention by Spencer rises to this level. Nor has Spencer established that his resignation was made "in reasonable reliance on misinformation received from

his employer." Commissioner of the Metropolitan Dist. Comm'n v. Civil Serv. Comm'n, 25 Mass. App. Ct. 573, 576 (1988).

Spencer does not allege that the Secretary promised to reinstate him as a CO-II, merely that she said she would "consider" it. He received no guarantee that he could revert, and he was informed of the "unprecedented" nature of his request, given his position as commissioner. He also was aware of the intense public scrutiny, the Governor's and the Secretary's insistence that he resign or be terminated, and that there be no strings attached to his resignation. No misinformation or fraud has been alleged here.

Spencer's claims also do not rise to the level of coercion or duress. The commission has consistently ruled that mere evidence that a resignation was made under threat of discharge or discipline is not enough. See, e.g., Forrest v. Weymouth Fire Dep't, 28 Mass. Civ. Serv. Rep. 480, 482 (2015). Although we recognize that Spencer was faced with a difficult choice when he was told that his resignation would be accepted only if it was unconditional, it was still a choice he freely made. See Monahan v. Romney, 625 F.3d 42, 47 (1st Cir. 2010), cert. denied, 563 U.S. 976 (2011) ("Because [the head of the commission] resigned [albeit under pressure from the Governor and the Governor's staff], his claim that defendants deprived him of a property interest within the meaning of the Due Process

Clause necessarily fails"); Worcester v. Civil Serv. Comm'n, 18 Mass. App. Ct. 278, 283 (1984) ("We do not imply that the choice put to the employee [under the civil service laws] is an easy one. However, . . . it is not our function to ignore the plain language of the statutes to avoid putting the employees to a difficult decision"). As the commission explained, "Mr. Spencer, an experienced senior manager, consciously chose the resignation route that afforded him the opportunity to write his own favorably-couched letter highlighting his career, rather than face a difficult and costly process that would have likely raised issues better left undisturbed." The decision to resign allowed Spencer to leave the department on his own terms and avoid further intense public scrutiny of his performance during a high profile investigation of Bridgewater State Hospital. Choosing to resign allowed Spencer to avoid the termination process altogether, but in so doing, Spencer lost whatever statutory entitlement he had to revert to his prior tenured position.

b. Jurisdiction. Spencer contends that the commission erroneously granted the department's motion to dismiss on the basis of lack of jurisdiction. The commission did mention that "this case does not invoke the [c]ommission's jurisdiction to conduct . . . a 'just cause' hearing under the proviso of [§] 46D," but that assertion is not the rationale for the

commission's decision.  Rather, as discussed, the commission evaluated whether Spencer fell within the plain language of the "termination of his service" provision in G. L. c. 30, § 46D. Spencer is apparently referencing his argument below that if the commission chose not to restore his position on the basis of G. L. c. 30, § 46D, in the alternative, it could do so under G. L. c. 31 or St. 1993, c. 310, § 1.

As discussed, G. L. c. 31, § 41, prohibits discharging, removing, or laying off a tenured civil service employee without just cause.  Where the appointing authority does not comply with G. L. c. 31, § 41, and "the rights of [the tenured civil service employee] have been prejudiced thereby," the employee is entitled to have his or her employment restored.  G. L. c. 31, § 42.  Similarly, under St. 1993, c. 310, § 1, where a person's civil service rights "have been prejudiced through no fault of [his or her] own, the [commission] may take such action as will restore or protect such rights."  Because Spencer resigned, and did so voluntarily, his rights were not prejudiced, and there is no basis for relief under either provision.

c.  Propriety of commission's factual findings.  Finally, Spencer also argues that the commission improperly made a finding of fact adverse to Spencer, despite ruling on a motion

to dismiss.[7]  In its decision, the commission stated that "for at least four days (July 24 to July 28), Mr. Spencer, while still occupying this position of [department] [c]ommissioner, knew that his resignation had been explicitly made unconditional but took no action to protest, rescind or dispute that decision, either before or after knowing those facts."  The commission later restated that in making the choice whether to resign or fight, Spencer "[knew] the consequences of both choices."  Spencer contends that this constituted a finding of fact that was both clearly erroneous and unsupported by substantial evidence.  We disagree.

According to Spencer's own affidavit, the Secretary informed Spencer that "[his] request to revert to [c]aptain could not be in [his] letter of resignation, and that if [he] did not allow that request to be removed, [his] employment would be terminated."  Thus, by Spencer's own account, he was informed that his resignation letter could not include the condition that he be allowed to revert.  In other words, he knew that the resignation letter had to be unconditional.  Yet, Spencer argues

---

[7] Spencer also argues that the commission improperly cited and applied the standard of review for motions for summary decision.  The commission contends that it has a long-standing practice of deciding motions to dismiss under the same standard as motions for summary disposition, as both are presumptively evidentiary motions.  See 801 Code Mass. Regs. § 1.01(7)(g)(1), (h).  We do not address this issue, as we conclude that the commission did not make improper findings of material fact.

that his resignation was not unconditional, because even after his conversation with the Secretary, he "fully believed and understood that, by legal right and past practice, he would be restored to a uniformed position, but that request could not be in the resignation letter itself."  This too is undermined by Spencer's own affidavit, which states that the Secretary said that "she would consider [his] request to be reinstated" (emphasis added), not that she would grant it.

Ultimately, Spencer takes issue with the commission's determination that Spencer's resignation was voluntary.  He believes the commission "resolved a contested issue of material fact" against him by doing so.  However, the voluntariness of his resignation was not simply a factual finding, but a legal one.  For the reasons discussed above, the commission correctly concluded that Spencer's resignation was voluntary.[8]

Judgment affirmed.

---

[8] Spencer also argues that the commission was incorrect to find he was still commissioner from July 24 to July 28, because the Secretary of the Executive Office of Public Safety & Security forwarded him the revised letter on July 24, and a Boston Globe article was published the same day indicating he had resigned.  To the extent there is a factual dispute as to Spencer's effective resignation date, it is not material.  The commission's analysis, although bolstered by the four-day timeline, was not contingent upon it.