# WATER DEPARTMENT OF FAIRHAVEN *VS.* DEPARTMENT OF ENVIRONMENTAL PROTECTION
## (and thirteen companion cases[1]).

Middlesex. November 3, 2009. - January 14, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Water. Department of Environmental Protection. Municipal Corporations,* Water commissioners, Water supply. *Administrative Law,* Adjudicatory proceeding, Agency's authority. *Statute,* Construction.

Discussion of the principles of statutory construction. [744-745]
Discussion of the background and framework of the Massachusetts Water Management Act, G. L. c. 21G, which has as its purpose the planning, establishment, and management of programs to assess the uses of water in the Commonwealth and to plan for future water needs. [745-749]
In a civil action, a Superior Court judge properly entered in favor of the plaintiff cities and towns a judgment declaring that the defendant Department of Environmental Protection (department) had exceeded its authority under the Massachusetts Water Management Act, G. L. c. 21G (Act), in imposing water conservation measures as conditions on the plaintiffs' renewal of their registration statements regarding their withdrawal of water, where the department did not first issue regulations requiring registrants to satisfy such conservation measures [749]; likewise, the judge properly entered a judgment declaring that the department exceeded its authority under the Act by notifying the plaintiffs of their right to request an adjudicatory hearing without first having acted by regulation to create such an administrative remedy for registrants [749-751].

CIVIL ACTIONS commenced in the Superior Court Department on January 25, January 28, January 30, January 31, February 1, and February 4, 2008, respectively.

After transfer and consolidation, the cases were heard by *Patrick F. Brady*, J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

---

[1]The cities of Brockton and Lynn and the towns of Duxbury, Hamilton, Harwich, Manchester-by-the-Sea, Mashpee, Mattapoisett, Medfield, Millis, North Reading, Sandwich, and Wellesley (or their water districts, departments, or commissions) all commenced actions against the Department of Environmental Protection (department).

*William L. Pardee*, Assistant Attorney General, for the defendant.

*William C. Henchy* for Water District of Sandwich & others.

*Gregg J. Corbo* (*Jeffrey T. Blake* with him) for city of Brockton & others.

The following were present but did not argue:

*Thomas P. Crotty* for Water Department of Fairhaven & another.

*Marguerite Reynolds* for town of Hamilton.

*Robert S. Troy* for town of Duxbury.

*Nancy Kaplan* & *Cheryl Blaine* for town of Medfield & another.

*Margaret Van Deusen* & *Michael Baram*, for Conservation Law Foundation & others, amici curiae, submitted a brief.

GANTS, J. These consolidated appeals concern the authority of the Department of Environmental Protection (department) under the Massachusetts Water Management Act (Act), G. L. c. 21G, to impose conservation measures on registered water suppliers (registrants) and to provide an administrative remedy to registrants aggrieved by those conservation measures.[2]

The plaintiffs represent fourteen Massachusetts cities and towns and their public water departments. Under the Act, each person (including the fourteen plaintiff cities and towns) that withdraws water from a water source in excess of the "threshold volume" of 100,000 gallons per day "shall file a registration statement" on or before January 1, 1988, setting forth its "existing withdrawal."[3] G. L. c. 21G, § 5. "[N]o person shall be deemed to have an existing withdrawal unless such person files a registration statement . . . ." G. L. c. 21G, § 2. Once

---

[2] We acknowledge the amicus brief submitted jointly by the Conservation Law Foundation; Mass Audubon; the Nature Conservancy in Massachusetts; Massachusetts Rivers Alliance, Inc.; Environmental League of Massachusetts, Inc.; Clean Water Action Massachusetts; Massachusetts Association of Conservation Commissions; Charles River Watershed Association, Inc.; Taunton River Watershed Alliance, Inc.; Jones River Watershed Association, Inc.; Connecticut River Watershed Council, Inc.; Merrimack River Watershed Council, Inc.; Nashua River Watershed Association, Inc.; Eel River Watershed Association, Inc.; and the Neponset River Watershed Association, Inc.

[3] "Existing withdrawal" is defined in G. L. c. 21G, § 2, as:

"[E]xcept as provided in [G. L. c. 21G, § 5], the average volume of water withdrawn from a particular water source during the five years

the registrant files its registration statement, the registrant is entitled to continue its existing withdrawal until the expiration of the registration statement, which may not exceed a term of ten years. G. L. c. 21G, § 5. On the expiration of a registration statement, "the registrant shall be entitled, upon the filing of a renewal registration statement, to continue existing withdrawals specified in the registration statement for a period of ten years." *Id.* The Act thereby guarantees that any registrant that registered before January 1, 1988, and timely renewed its registration statement may continue forever to withdraw water at the rate of its existing withdrawal.[4]

On or before January 1, 1988, the plaintiffs filed registration statements with the department in accordance with the Act. In 1998, the plaintiffs renewed their registrations for another ten-year period, which expired on January 1, 2008. Both the initial registrations and the 1998 renewals required the plaintiffs to meet basic metering, record-keeping, and reporting requirements. The plaintiffs were otherwise unrestrained with respect to usage of their existing withdrawals of water, provided they did not exceed the registered volumes.

In administering the 2008 renewal process, the department has imposed new "registration conditions" on all registrants. These conditions are, in effect, conservation measures. By December

---

prior to January, [1986]; provided, however, that if, during such period of five years, withdrawals from the water source have been interrupted due to contamination of the water source, the periods of such interruptions shall be excluded pro rata from the computation of existing withdrawal."

General Laws c. 21G, § 5, provides:

"The department shall, by regulation, establish a procedure for recognizing, as an existing withdrawal, a volume of water in excess of the average volume of water withdrawn from a particular water source during the period from [January 1, 1981,] to [January 1, 1986,] if such volume of water is within the normal variation of withdrawals made by the registrant; provided that the department shall not use such procedures to recognize, as existing withdrawals, such volumes of water which together exceed the safe yield of the water source from which the withdrawals are being made."

[4]The only exception to this guarantee is that, if "a state of water emergency" is declared under G. L. c. 21G, § 15, the department may issue an order directing a registrant "to reduce, by a specified volume, the withdrawal or use of any water; or to cease the withdrawal or use of any water." G. L. c. 21G, § 17 (3).

31, 2017, each registrant's water consumption is to be limited to sixty-five residential gallons per capita per day, and unaccounted-for water loss is to be no more than ten per cent of the total usage. If the registrant fails to demonstrate adequate progress toward meeting these performance standards, "the [r]egistrant shall develop and implement an annual compliance plan" designed to meet them. The conditions also mandate adherence to the department's seasonal demand management plan by May 1, 2009, which restricts outdoor water use from May through September when the drought level is above normal. The department reserves the right to commence enforcement measures against the registrant if it does not make "demonstrable progress towards meeting these performance standards, or if it has not developed and implemented an annual compliance plan that is reasonably designed" to meet them.[5] In imposing these new conservation requirements as conditions for registration renewal, the department is seeking to restrict the manner in which water is used, but it does not seek to decrease the registrants' total water usage below the existing withdrawals to which they are entitled.

In announcing the new conditions, the department informed registrants of their opportunity to request an administrative hearing if they were aggrieved by any part of the registration renewal process. The plaintiffs challenged in the Superior Court the department's authority under the Act to impose these conditions on registration renewals and to create an adjudicatory process to resolve grievances regarding these conditions. The cases were consolidated and heard on cross motions for summary judgment. The Superior Court judge awarded declaratory relief to the plaintiffs under G. L. c. 231A, concluding that the department had exceeded its authority both in imposing the conditions and in creating the adjudicatory process. Furthermore, the judge concluded that, because the administrative remedy was not statutorily authorized, the plaintiffs could not be required to exhaust their administrative remedies before filing suit. The department appealed, and we granted its application for direct appellate review.

---

[5]The conditions also prohibited registrants from charging for water services on a descending unit rate basis, that is, charging lower unit prices to a user as its water use increases during the billing period. However, the plaintiffs, all of which are cities and towns, were already prohibited by statute from billing on a descending unit rate basis. G. L. c. 40, § 39L.

*Discussion.* This case presents a question of statutory construction. "We review questions of statutory interpretation de novo. . . . We give substantial deference to a reasonable interpretation of a statute by the administrative agency charged with its administration enforcement . . . ." (Citations omitted.) *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 481 (2006). See *Massachusetts Med. Soc'y* v. *Commissioner of Ins.*, 402 Mass. 44, 62 (1988) ("Where the [agency's] statutory interpretation is reasonable . . . [we do] not supplant [its] judgment"). However, in deferring to the administrative body, we do not abdicate our judicial responsibility. See *Town Fair Tire Ctrs., Inc.* v. *Commissioner of Revenue*, 454 Mass. 601, 605 (2009). "An incorrect interpretation of a statute by an administrative agency is not entitled to deference." *Kszepka's Case*, 408 Mass. 843, 847 (1990), and cases cited. "The duty of statutory interpretation rests ultimately with the courts." *Town Fair Tire Ctrs., Inc.* v. *Commissioner of Revenue, supra,* and cases cited.

Our primary duty in interpreting a statute is "to effectuate the intent of the Legislature in enacting it." *International Org. of Masters* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 392 Mass. 811, 813 (1984). We begin with the language of the statute, as "the principal source of insight into legislative intent." *Providence & Worcester R.R.* v. *Energy Facilities Siting Bd.*, 453 Mass. 135, 142 (2009), quoting *New Bedford* v. *Energy Facilities Siting Council*, 413 Mass. 482, 485 (1992), S.C., 419 Mass. 1003 (1995). Where the words are "plain and unambiguous" in their meaning, we view them as "conclusive as to legislative intent." *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 839 (1986). Where the meaning of a statute is not plain from its language, we consider "the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *DiFiore* v. *American Airlines, Inc.*, 454 Mass. 486, 490 (2009), quoting *Industrial Fin. Corp.* v. *State Tax Comm'r*, 367 Mass. 360, 364 (1975). See *Oxford* v. *Oxford Water Co.*, 391 Mass. 581, 588 (1984), quoting *Commonwealth* v. *Welosky*, 276 Mass. 398, 401-402 (1931), cert. denied, 284 U.S. 684 (1932) ("Statutes are to be interpreted . . . in connection with their development, their progression through the legislative body, the history of the times . . ."). "Where possible, we

construe the various provisions of a statute in harmony with one another, recognizing that the Legislature did not intend internal contradiction." *DiFiore* v. *American Airlines, Inc.*, *supra* at 491.

1. *The background of the Act.* The Act was a direct response to calls for action issued by two separate studies, one commissioned by the executive branch and the other by the Legislature, that reviewed the Commonwealth's water supply and related policies in the late 1970's and early 1980's. The study commissioned by the Executive Office of Environmental Affairs began:

> "In reviewing Massachusetts' water situation, it is evident that a far better balance is needed between water use and water conservation. The uses are many, the demands are growing, and thus far the state-local management response has been solely toward accommodating demand. In future years, if all reasonable uses are to be accommodated, if resource and environmental values are to be protected, a new response in the form of managing demand will be required."

Massachusetts Water Supply Policy Statement: Summary Report 2 (1978) (1978 Water Supply Policy Statement). While acknowledging that "conflicts in water use are inevitable," the 1978 Water Supply Policy Statement expressed dismay over the lack of a comprehensive approach to water conservation in the Commonwealth, as well as "the lack of public awareness of the limitations of the water supply and the compromises necessary to assure a continued supply." *Id.* at 4. The study recommended the implementation of a centralized Statewide water conservation program. *Id.* at 22.

In 1977, the Legislature established a Special Legislative Commission on Water Supply (special commission), see Res. 1977, c. 13, that contracted with an independent law firm with expertise in environmental law "to research existing Massachusetts and federal groundwater law to identify gaps which needed to be filled in the Commonwealth, to look at laws of other states, and to make recommendations concerning legislation which would provide a suitable water resources management framework for Massachusetts with regard to identification of water use, protection of existing users, allocation of water among competing demands, and the integration of ground and surface water as a single hydrologic system." 1983 Senate Doc. No. 1826. The

resulting report found the existing legal framework to be inadequate to promote water conservation in the Commonwealth. See *id.* (reprinting M.S. Baram & J.R. Miyares, Groundwater: Legal and Institutional Analysis [1982]). To rectify the inadequacy, it proposed legislative adoption of the Act, which the Legislature in 1985 enacted essentially as proposed. Compare *id.* with St. 1985, c. 592, § 1.

*2. The framework of the Act.* Section 3 of G. L. c. 21G sets forth the Act's statement of purpose. It requires the department and the water resources commission (commission) of the Executive Office of Environmental Affairs to cooperate "in the planning, establishment and management of programs to assess the uses of water in the commonwealth and to plan for future water needs." *Id.* The commission is to "adopt principles, policies and guidelines necessary for the effective planning and management of water use and conservation in the commonwealth and for the administration of this chapter as necessary and proper to ensure an adequate volume and quality of water for all citizens of the commonwealth, both present and future." *Id.* "Such principles, policies and guidelines shall be designed to protect the natural environment of the water in the commonwealth; to assure comprehensive and systematic planning and management of water withdrawals and use in the commonwealth, recognizing that water is both finite and renewable; and to allow continued and sustainable economic growth throughout the commonwealth and increase the social and economic well being and safety of the commonwealth's citizens and of its work force." *Id.*

Section 3 also grants authority to the department, after consulting with the water resources management advisory committee[6] and obtaining the approval of the commission, to "adopt such regulations as it deems necessary to carry out the purposes of [the Act], establishing a mechanism for managing ground and surface water in the commonwealth as a single hydrological system and ensuring, where necessary, a balance among competing water withdrawals and uses." *Id.* In short, water management, including water conservation, is an important purpose of the Act,

---

[6]The Massachusetts Water Management Act (Act), G. L. c. 21G, establishes a water resources management advisory committee, appointed by the Governor and representing the various interest groups and industries, including at least one environmental organization. G. L. c. 21G, § 3.

and the department, with the advice of the water resources manage-
ment advisory committee and the approval of the commission,
has broad authority to issue regulations to carry out this purpose.

The Act allows for the withdrawal of water by private and
public water suppliers in two ways: (1) by registration, and (2) by
permit. Withdrawal by registration is treated very differently from
withdrawal by permit. As noted earlier, the Act "grandfathered"
a registrant's entitlement to existing withdrawals, provided the
registrant timely filed a registration statement and renewals.[7]
Because the registrant's entitlement to existing withdrawals is
grandfathered, the registrant is not required to obtain permission
to continue existing withdrawals; it is simply required to provide
information in the registration statement specified by the depart-
ment's regulations. G. L. c. 21G, § 6.[8] Because no permission is
needed to continue existing withdrawals, and because the only
decision the department needs to make is to ensure that the form,
contents, and filing of the registration statement or renewal satis-
fies the regulatory requirements, the Legislature did not anticipate

[7]In 1987 and 1988, the department, then known as the Department of
Environmental Quality Engineering, stated that the purpose of the registration
process was to record water usage and "grandfather" the registrant's entitle-
ment to existing withdrawals. See Department of Environmental Quality
Engineering, Water Management Act Registration Guidelines 2 (July 1987)
(registration "serves to document water use and to grandfather the rights to
this amount of water to the registrant"); Department of Environmental Quality
Engineering, The Water Management Act: Questions and Answers 7 (Sept.
1988) ("purpose of registration is to gather historical water withdrawal informa-
tion and to grandfather certain previously existing withdrawals").

[8]Under G. L. c. 21G, § 6, "[a]t a minimum, such regulations shall specify
that the registration statement must contain the following:

"(1) The use for which the water is being withdrawn;

"(2) An identification of the water source from which the withdrawal is
being made, in sufficient detail to describe the water source adequately;

"(3) The location of the withdrawal;

"(4) The existing withdrawal; provided, however, that persons whose
volumes of withdrawals varies seasonally according to a substantially
existing pattern shall describe that variation;

"(5) Conservation measures instituted, or to be instituted, by the
registrant; and

"(6) The point or points at which the water is to be discharged after
use."

the need for an adjudicatory hearing for persons aggrieved by a department decision regarding existing withdrawals. See G. L. c. 21G, § 12.

In contrast, withdrawal by permit can only be done, as the name implies, if permitted by the department. G. L. c. 21G, § 7 ("No person may, after the effective date thus specified, make a new withdrawal of more than the threshold volume of water from any water source . . . unless such person obtains a permit in accordance with regulations adopted by the department"). In establishing the criteria and standards for permits, the department is to consider a number of factors, including the impact of the proposed withdrawal on other hydrologically interconnected water sources, the water available within the proposed water source's safe yield, and "[r]easonable conservation practices and measures, consistent with efficient utilization of the water." *Id.* Permit applications are required to detail the anticipated environmental impact of the proposed withdrawal and to consider alternatives to lessen that impact. G. L. c. 21G, § 8. The department, in its sound discretion, "may issue permits for any new withdrawal of water if it determines that the withdrawal will conform to the regulatory standards established," but it must deny a permit if the proposed withdrawal would exceed the water source's safe yield. G. L. c. 21G, § 11. In granting a permit, the department may attach any conditions it deems necessary to further the Act's purposes or to assure compliance with its regulations. *Id.* The department must make written findings of fact in support of its decision, and must state with specificity its reasons for issuing or denying a permit, or for imposing conditions on the permit. *Id.* Any person aggrieved by the denial of a permit or by the conditions imposed on its issuance is entitled to an adjudicatory hearing before the department in accordance with G. L. c. 30A. G. L. c. 21G, § 12.

Therefore, under the Act, the department has broad authority under § 3 to issue regulations to carry out the Act's purpose of water management, including water conservation, provided it does not infringe the registrants' entitlement to existing withdrawals. Pragmatically this means that the department, by regulation, may impose conservation measures on all water users, including registrants, but those conservation measures may not deny registrants their entitlement to existing withdrawals (for instance, by

limiting a registrant's water use to less than the existing withdrawal).

3. *The department's "registration conditions."* The conservation measures imposed on the plaintiff registrants as "registration conditions" might have been lawful if they had been imposed by regulation on all registrants under G. L. c. 21G, § 3, but they were not. As discussed, G. L. c. 21G, § 3, gives substantial authority to the department to carry out the purposes of the Act, but only through the adoption of regulations. The department notes, correctly, that under the Act it may impose conditions on any permit without regulation, but it fails to recognize that the Act does not grant the department the same authority with respect to the filing of registration statements and renewals. Compare G. L. c. 21G, § 11, with G. L. c. 21G, § 5. Here, the department did not issue regulations requiring registrants to satisfy these conservation measures. Instead, they were listed as new conditions on the plaintiffs' registration renewals. The failure to issue regulations authorizing these conditions renders their inclusion in registration renewal statements unlawful.

The department, by regulation, has imposed "registration conditions" on registrants, but each of these conditions requires the accurate metering, monitoring, and recording of the withdrawal of water, and is designed to ensure that a registrant does not abuse its registration by withdrawing more water than its existing withdrawal.[9],[10] None of the "registration conditions" presently imposed by regulation requires conservation measures. 310 Code Mass. Regs. § 36.08(3) (2005). If the department wishes to require registrants to take specified conservation measures, it must do so by regulation.

4. *Adjudicatory proceeding.* In the renewal registration statements that contained the conservation measures that we now conclude are invalid because of the department's failure to adopt

---

[9]Title 310 Code Mass. Regs. § 36.08(3) (2005) imposes on registrants the following conditions: "(a) The installation of flow meters; (b) The accurate recording and record keeping of all future withdrawal information; (c) Estimated registration statements must be verified within five years; (d) The submittal to the [d]epartment of additional historical water use data . . . . Such information shall be used to calculate a verified existing withdrawal value from current withdrawal information."

[10]We need not decide here whether a registrant's failure to comply with these conditions may allow the department to refuse to accept a registration renewal.

them by regulation, the department notified registrants of their right to "request an adjudicatory hearing." The plaintiffs argue that the department's adjudicatory process for registrants is ultra vires because the Act authorizes such an adjudicatory proceeding not for registrants, but only for permittees and those water suppliers seeking to add to their existing withdrawals. See G. L. c. 21G, § 12.[11]

In deciding whether the department may create an adjudicatory process for registrants aggrieved by a department decision, we return to the same broad grant of authority given to the department under G. L. c. 21G, § 3, to "adopt such regulations as it deems necessary to carry out the purposes" of the Act. In *Massachusetts Respiratory Hosp.* v. *Department of Pub. Welfare,* 414 Mass. 330, 333 (1993), we held that the Department of Public Welfare had the authority to adopt a regulation creating a Medicaid claims review board even though "no statutory language explicitly authorized the adoption of such a regulation." "An agency has wide authority to interpret and implement a policy set out broadly in its governing statutes." *Id.,* and cases cited. In that case, the enabling statute authorized the agency to " 'adopt, promulgate, amend and rescind rules and regulations suitable or necessary' to administer the Medicaid program." *Id.* at 334, quoting G. L. c. 118E, § 4. Here, the Act gives the department broad latitude to adopt regulations, comparable to that given by statute to the Department of Public Welfare. Therefore, we conclude that the department has the regulatory authority to create an administrative adjudicatory proceeding for registrants, including the plaintiffs, who seek to challenge adverse decisions rendered by the department.[12] See *id.* at 333-334. See also *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n,*

---

[11]The department initially sought dismissal of the plaintiffs' claims because of their failure to exhaust the administrative remedy it had created. On appeal, it waives its exhaustion defense, but presses its argument that it had the statutory authority to create such a remedy.

[12]We recognize that registrants will be subject to fewer adverse decisions by the department than those applying for permits. Yet, that does not mean that registrants may not suffer adverse decisions that may warrant agency adjudication. For instance, if the department were to assess a civil penalty under G. L. c. 21G, § 14, or reject a registration renewal because of the registrant's purported failure accurately to meter, monitor, or record water use in accordance with existing regulations, 310 Code Mass. Regs. § 36.08(3) (2005), it would further the purposes of the Act to provide an administrative hearing to

421 Mass. 570, 586-587 (1996) (enabling statutes give administrative agencies broad power to promulgate both procedural and substantive regulations).

We recognize that the Act provides an adjudicatory hearing only for those aggrieved by a decision of the department "with respect to a permit application or an addition to an existing withdrawal." G. L. c. 21G, § 12. We do not interpret this provision of the Act to prohibit the department from adopting regulations providing an adjudicatory hearing for those aggrieved by other types of decisions it has made. See *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 76 (1979) ("Specific statutory authority to act in a particular respect does not bar consistent action under general statutory authority").

While the department has the regulatory authority to create an adjudicatory proceeding for registrants, it must do so by regulation. The fatal flaw with the adjudicative process that the department has furnished to registrants is that it was not authorized by regulation. Having not acted by regulation as required by the Act, the department's creation of an administrative remedy for registrants cannot survive the plaintiffs' challenge.

5. *Conclusion.* We modify and affirm the Superior Court's judgment as follows, adding the italicized words:

> "The Department of Environmental Protection *may, by regulation,* impose conservation measures on registrants, *provided that those measures do not infringe the registrants' entitlement to existing withdrawals.* The Water Management Act does not authorize the Department of Environmental Protection, *in the absence of regulations,* to condition a withdrawal registration renewal. *Therefore,* the plaintiffs *were entitled to* file their *2009* registration renewals, without conditions, with the Department of Environmental Protection."

*So ordered.*

---

the aggrieved registrant. Similarly, if the department were to issue regulations requiring registrants to comply with the same conservation measures at issue here, it would further the purposes of the Act to provide an agency adjudicatory process to resolve a registrant's claim that the conditions were so severe that they effectively denied the registrant its entitlement to existing withdrawals.