BROWN vs. DENNISON, MISC 21-000218

































 
 WILLIAM SCOTT BROWN, Individually and as President of BROWN BUILT CONSTRUCTION CORP., Plaintiff, v. WAYNE DENNISON, JUDITH BARRETT KATHLEEN MUNCEY, BORYS GOJNCYZ, and PHILIP THORN, as they are members of the Zoning Board of Appeals for the Town of Duxbury, and the ZONING BOARD OF APPEALS OF THE TOWN OF THE TOWN [sic] OF DUXBURY, Defendants
 MISC 21-000218 
 OCTOBER 7, 2021
PLYMOUTH, ss.
ROBERTS, J.
MEMORANDUM OF DECISION ALLOWING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT














 INTRODUCTION 





 Plaintiff William Scott Brown ("Mr. Brown"), individually and as president of Brown Built Construction Corp. ("BBCC" and, collectively, "Plaintiffs"), [Note 1] commenced this appeal pursuant to G. L. c. 40A, § 17, with the filing of a complaint ("the Complaint") on April 20, 2021 against defendants Wayne Dennison, Judith Barrett, Kathleen Muncey, Borys Gojncyz and Philip Thorn, as members of the town of Duxbury ("the Town") zoning board of appeals ("the ZBA"). BBCC sought a special permit to raze the existing building and construct a mixed-use development at 116 Tremont Street, Duxbury, consisting of commercial/retail space on the first floor and four one-bedroom apartments on the second floor ("the Project"). BBCC appeals from the ZBA's April 9, 2021 decision ("the Decision") granting the special permit, but conditioning it on the requirement that one apartment be affordable housing eligible for the Chapter 40B Subsidized Housing Inventory ("the Affordable Housing Condition"). BBCC filed Plaintiffs [sic] Motion For Summary Judgment ("the Motion") and supporting papers on July 7, 2021. The ZBA filed its opposition thereto and cross-motion for summary judgment on August 12, 2021 ("the Cross-Motion"). A hearing on the Motion and Cross-Motion was held on August 26, 2021, followed by the filing of supplemental briefs. This memorandum of decision follows. For the reasons set forth below, the Motion is ALLOWED and the Cross-Motion is DENIED. 





UNDISPUTED FACTS 





 The following facts established in the record and pertinent to the Motion and Cross-Motion are undisputed or are deemed admitted. 





 1. BBCC is a Massachusetts corporation in the business of building, marketing, maintaining, reconstruction [sic], remodeling and all other aspects of residential commercial construction with a principal place of business of 1 Tremont Street, Kingston, Massachusetts. Defendants' Response To Plaintiffs' Statement Of Material Facts In Support Of Motion For Summary Judgment And Statement Of Additional Material Facts ("SOMF") ¶ 1. 





 2. The property at issue is Parcel No.062-751-644 in the Town's board of assessors' database and consists of approximately 19,910 square feet located in the Neighborhood Business District 1 zoning district at 116 Tremont Street, Duxbury. SOMF ¶ 2. 





 3. On or about March 10, 2020, STS3 Realty Trust, as the owner of the Property, and BBCC applied to the ZBA for a special permit to construct a mixed-use building ("the Application"). Affidavit Of Lauren Hache, sworn to on August 11, 2021 ("Hache Aff."), Ex. 1. 





 4. On or about June 11, 2020, defendant Judith Barrett, the Chair Pro Tem, opened the public hearing to consider the Application. SOMF ¶ 5. 





 5. On or about June 25, 2020, the ZBA voted 4-1 to grant the requested special permit with conditions. SOMF ¶ 7. 





 6. On April 9, 2021, after restrictions and delays caused by the COVID-19 pandemic, the ZBA issued the Decision, granting the special permit with conditions. SOMF ¶ 8. 





 7. The condition at issue contained in the Decision provides: 





 One of the four one-bedroom units shall be affordable housing that is eligible for the Chapter 40B Subsidized Housing Inventory (SHI), as determined by the Massachusetts Department of Housing and Community Development (DHCD) under the guidelines of the Local Action Units (LAU) Program. Prior to issuance of a certificate of occupancy for the residential unit that will be designated as affordable housing, the applicant shall cause to be submitted to DHCD an application to request that the unit be approved for the Subsidized Housing Inventory as a Local Action Unit. Upon issuance of LAU approval from DHCD and recording with the Plymouth County Registry of Deeds an affordable housing restriction in a form approved by DHCD and Town Counsel, a certificate of occupancy may be issued for the affordable unit. Such restriction shall be enforceable and in effect for a minimum of 30 years. 





 Plaintiffs Statement Of Material Facts In Support Of Motion For Summary Judgment ("PSOMF"), Ex, A, Decision at 5. 





 8. BBCC filed this G. L. c. 40A, § 17, appeal of the Decision on April 20, 2021. 





 The Duxbury Housing Production Plan 





 In support of its Cross-Motion, the ZBA submitted the April 1, 2019 Duxbury Housing Production Plan ("the HPP"). Hache Aff., Ex. 3. As noted by the ZBA, the HPP reached the following conclusions: 





 An estimated 72% of renter households in the Town pay at least 30% of their income toward rent, HPP at 9; 





 The high percentage of rent-burdened households indicates a demand for affordable rental housing in the Town, HPP at 26; 





 The Town largely consists of single-family homes (90%) and there are few rental options, particularly for lower-income residents, HPP at 10; 





 Wait time for housing provided by the Plymouth Housing Authority, which manages public units for the Duxbury Housing Authority, is two or more years, HPP at 10-11; 





 Market rents are out of reach for low-income residents in Duxbury in area rental housing, HPP at 11; 





 There is a substantial gap between the sales price of an affordable home for a low-income family of four-$234,000 for a single-family and $174,500 for a condominium-and the average list prices actually available for market rate homes in Duxbury, HPP at 58. 





 In addition to or in further elaboration of those conclusions, the HPP states the following: 





 "The town largely consists of single-family homes (90%), and the vast majority of housing units (89%) are ownership units. There are few rental options, particularly for lower-income residents." HPP at 10. 





 "The Town of Duxbury creates the opportunity for the development of affordable housing through the Inclusionary Housing, Affordable Housing, and Accessory Apartment sections of the Zoning Bylaw. In a more indirect way, the By-law addresses affordable housing through the Residential Conservation Cluster approach, the Planned Development Districts provision, and the Neighborhood Business District provisions of the By-law. The Demolition Delay Bylaw, part of the Town's General By-laws, can also contribute to affordable housing." HPP at 66. 





 "Most uses in Duxbury require a Special Permit from either the Zoning Board of Appeals or the Planning Board. ... While it provides greater protection for a Town, the Special Permit process is lengthy and expensive, according to many developers. ... In summary, certain parts of the Zoning By-law discourage the construction of affordable housing in Duxbury while other parts of the By-law, that directly address affordable housing, are ineffective." HPP at 66-67. 





 "According to the Duxbury Zoning Bylaw, [the Inclusionary Housing Provision], adopted in 2004, sets out policies for the development of affordable housing.... The Inclusionary Provision to the Bylaw also applies to multiple units, specifically the construction of 6 or more dwelling units in a Planned Development, whether on one or more contiguous parcels. This type of project requires a Special Permit from the Zoning Board of Appeals." HPP at 68. 





 "The purpose of this section [Affordable Housing], according to the By-law, is to provide a mechanism for the construction of affordable housing units for low and moderate income individuals. ... Adopted in 2008, this provision applies only to eligible pre-existing non-conforming lots that meet strict criteria specified in the By-law." HPP at 70. 





 "Provisions in the Zoning By-law that address the production of Affordable Housing are located in many different sections of the By-law, as are the requirements for permitting and approval of Affordable Housing, specifically those requirements for the issuance of a Special Permit and Administrative Site Plan Review. For example, there are several sets of standards for issuance of a Special Permit, which creates confusion." HPP at 81. 





 "Adopted in 2004, the inclusionary housing provision has only yielded one off[-] site affordable unit and a substantial pay-out for a development approved in 2007. Developers avoid the trigger for mandatory provision of affordable units by submitting a subdivision plan that is just under the number of lots required to provide an affordable housing unit(s) [sic], typically as a 3 or 4 subdivision plan." HPP at 83. 





 "Mixed Use - Development projects that combine different types of development such as residential, commercial, office, industrial and institutional into one project. Mixed-use redevelopment of neighborhoods promotes comprehensive revitalization through retention or addition of housing, services and jobs." HPP at 96. 





 Relevant Provisions of the Town's Zoning Bylaws 





 The following provisions of the Town's Zoning Bylaws ("the ZBL") are relevant to this appeal. 





 ARTICLE 400 - USE, INTENSITY, DIMENSIONAL AND COVERAGE REGULATIONS FOR ALL DISTRICTS 





 410 Residential Compatibility District 





 410.1 Permitted Uses and Structures 





 ...





 In a Residential Compatibility District no building or accessory structure shall be erected or altered and no building, accessory structure or land shall be used for any purpose or in any manner other than is permitted and set forth herein. 





 1. Detached, single-family dwelling. 





 2. Religious. 





 3. Educational. 





 4. Accessory use and accessory structures on the same lot which are customarily incidental to a single-family residence. 





 5. Trailer for a temporary residential occupancy only for a period totaling not more than six (6) months on a premises whose dwelling has been destroyed by fire with a permit from the Zoning Enforcement Officer. 





 6. The keeping of one (1) service type vehicle not to exceed ten thousand (10,000) pounds gross weight by a resident who carries on a trade or profession away from his/her premises. 





 ...





 410.3 Uses and Structures Permitted by Special Permit 





 The following uses and structures are permitted, and only to the extent authorized, by a Special Permit from the Board of Appeals. The Planning Board shall be the Special Permit Granting Authority for Residential Conservation Cluster Developments: 





 1. Stand for the sale of produce raised on the premises. 





 2. Home occupation in accordance with Section 410.7. 





 3. Conversion of a single-family dwelling in existence for ten (10) years prior to the application for a special permit in accordance with Section 410.6. 





 4. Cemetery 





 5. Golf course. 





 6. Hospital, convalescent home, sanatorium, institution, including a continuing care or similar assisted living retirement facility for persons age 62 and over operated in connection with a skilled nursing facility subject to state licensure. Any such use to be reviewed pursuant to the applicable provisions of Article 800 of the Protective Bylaw, or philanthropic use. 





 7. Riding stable. 





 8. Bed and Breakfast within existing footprint of an existing single-family dwelling, in which the operator resides. 





 9. Private club not conducted for profit and not containing sleeping quarters for more than four (4) persons. 





 10. Residential Conservation Cluster Development in accordance with Section 540. 





 11. Wireless Telecommunications Services Facility in accordance with Section 610. 





 12. Veterinary Hospital for the care and treatment of domestic animals.





 ...





 421-A Neighborhood Business Light District 





 421A.1 Permitted uses and Structures 





 1. Uses and structures as permitted by Section 410.1 and 410.3 in accordance with all intensity, dimensional and coverage regulations of 410.4. 





 ...





 421A.3 Uses and Structures That May Be Permitted Subject to Special Permit and Site Plan Requirement 





 The following uses shall only be permitted by a special permit from the Board of Appeals when the off-street parking requirement is more than three (3) vehicles and/or off-street loading space is required. ... 





 1. Professional office for dental, architectural, engineering, renewable and alternative energy research and development, legal, medical, and other similar recognized professions; medical and dental clinics, including retail uses accessory thereto providing no more than twenty-five percent (25%) of the rentable floor space in a principal building exclusive of all storage areas is used therefor. 





 2. Real estate, insurance and general business office, banks, telephone office. 





 3. Dwelling in a business structure above the ground floor. 





 ...





 421A.4 Special Permit Uses 





 1. Retail sale of food items, including confectionary, dairy products, fruits, vegetables, groceries and meats. 





 2. Sale of baked goods and the manufacture of same for sale. 





 3. Sale of dry goods, variety merchandise and handicraft work. 





 4. Sale of clothing and clothing accessories. 





 5. Sale of hardware, household items including appliances, furniture, furnishings and supplies. 





 6. Sale of printed matter, drugs, stationery and photographic supplies. 





 421 Neighborhood Business District 1: Use And Regulations





 ... 





 421.1 Permitted Uses and Structures 





 1. Uses and structures permitted by Section 410.1 and 410.3 in accordance with all intensity, dimensional, and coverage regulations of Section 410.4. 





 2. Signs in accordance with Section 601. 





 3. The keeping of any registered commercial motor vehicle. 





 ...





 421.3 Uses and Structures That May Be Permitted Subject to Special Permit and Site Plan Requirement 





 The following uses shall only be permitted by a special permit from the Board of Appeals when the off-street parking requirement is more than three (3) vehicles and/or off-street loading space is required. ... 





 1. Uses allowed in NB Light and as described in Section 421A.3. 





 2. Public transportation passenger station and right-of-way passenger bus terminal. 





 3. Shop of an electrician, painter, paper-hanger, plumber, upholsterer, carpenter or cabinet-maker and similar trades. 





 421.4 Special Permit Uses 





 1. Special Permit Uses allowed in NB Light and as described in Section 421A.4. 





 ...





 424 Special Permit Procedures And Criteria For Neighborhood Business Districts L, 1 And 2 





 1. The Special Permit Granting Authority. The special permit granting authority (SPGA) under this Bylaw shall be the Board of Appeals. 





 ...





 4. Criteria: In approving a special permit under this section, the Board of Appeals shall, to the degree consistent with a reasonable use of the site for the purpose permitted within a Neighborhood Business District in which it is located, provide for the following: 





 a. Protection of adjoining premises against detrimental or offensive uses on the site; 





 b. Adequacy of space for vehicular access to the site and off-street parking and loading/unloading on the site; 





 c. Convenience and safety of vehicular and pedestrian movement within the site and in relation to adjacent ways and land; 





 d. Adequacy of water supplies and distribution for domestic use fire protection; 





 e. Adequacy of the methods of storage and disposal of sewage, refuse and other wastes resulting from the uses permitted on the site and the methods of drainage or retention of surface water; 





 f. Maintenance and promotion of dispersed shade on paved areas through the effective use of established and/or new trees; and 





 g. Conformance to sign regulations in Section 601.





 ...





 ARTICLE 500 - REQUIREMENTS FOR CERTAIN LAND DIVISIONS, LAND DEVELOPMENTS, AND INCLUSIONARY HOUSING 





 530 Division Of Land And Development Of Multiple Dwellings 





 530.1 Purpose 





 The purpose of this Bylaw is to ensure that land divisions, subdivisions, and developments of multiple dwellings on single lots are afforded the depth and breadth of review allowed by G.L. c. 40A, sec. 9 to adequately protect public health, safety and welfare of the current and future residents of the Town. This Bylaw, in concert with Section 540, 560 and/or 906.2 allows the Board of Appeals or Planning Board to grant a special permit for land divisions, subdivisions and large multi-unit developments, provided specific enumerated criteria are satisfied. 





 530.2 Applicability 





 ...





 3. The construction of six (6) or more dwelling units on land that does not require land division and/or subdivision, whether on one or more contiguous parcels held in single ownership as of January 1, 2001 or any time thereafter, shall require a special permit from the Board of Appeals under Article 700. 





 ...





 540 Residential Conservation Cluster 





 ...





 540.11 Affordable Component 





 As a condition of the grant of any special permit for a RCC Development containing six (6) or more lots or dwelling units, the Planning Board shall ensure compliance with Section 560 ("Inclusionary Housing") of the Zoning Bylaw. 





 ... 





 560 Inclusionary Housing 





 560.1 Purpose and Intent 





 The purposes of this Bylaw is to outline and implement a coherent set of polices and objectives for the development of affordable housing in compliance with the Duxbury Comprehensive Plan, G.L. c. 40B sec. 20-23 and ongoing programs within the Town to promote a reasonable percentage of housing that is affordable to moderate income buyers. It is intended that the affordable housing units that result from this Bylaw be considered as Local Initiative Program (LIP) dwelling units in compliance with the requirements for the same as specified by the Department of Community Affairs, Division of Housing and Community Development and that said units count toward the Town's requirements under G.L. c. 40B sec. 20-23. 





 ...





 560.3 Applicability 





 ...





 2. Multiple Units. This Bylaw shall apply to the construction of six (6) or more dwelling units in accordance with Section 700 of the Zoning Bylaw, whether on one or more contiguous parcels, and shall require a special permit from the Board of Appeals. 





 ...





 560.5 Provision of Affordable Units 





 The Planning Board or Board of Appeals shall deny any application for a special permit for development under Sections 530, 540 and 700, and this section if the applicant for special permit approval does not agree that: 





 1. At least ten percent (10%) of the ... units in a multiple unit development subject to this Bylaw shall be established as affordable housing units in any one or combination of methods provided for below.... 





 570 Affordable Housing 





 570.1 Purpose 





 To facilitate affordable housing development on qualified pre-existing non-conforming lots as defined by this Bylaw. ... 





 ARTICLE 700 - DESIGN STANDARDS FOR PLANNED DEVELOPMENTS 





 701 Purpose 





 This section of the Bylaw establishes standards for the design and review of a development application for a planned development. Guidelines are stated under which considerable design flexibility and evaluation can be exercised. ...





 ...





 718 Inclusionary Housing Requirements 





 The provisions of Section 560 of the Zoning Bylaw shall, so far as applicable, apply to Planned Developments. 





 ...





 ARTICLE 900 - ADMINISTRATION 





 ...





 906 Board of Appeals 





 A Board of Appeals is hereby established which shall have all of the powers of a Board of Appeals under G.L. c. 40A. ... 





 Said Board of Appeals shall exercise the authority and powers and perform the duties set forth in G.L. c. 40A, in this Bylaw and the following: 





 ...





 906.2 Special Permits 





 To hear and decide applications for Special Permits as provided in this Bylaw, subject to any general or specific rules therein contained, and including authority to impose appropriate terms, conditions and safeguards in its decisions. 





 Applications shall be approved only upon the Board's written determination that the proposal's benefits to the Town will outweigh any adverse effects for the Town or vicinity after consideration of the following, among other things, were germane [sic]: 





 ...





 2. Activity type, mix and intensity, taking the following into consideration: 





 a) Whether the proposal contributes to the diversity of services available locally; 





 b) Seasonal consequences, including addition to peak period congestion; 





 c) Service to local, in preference to regional, markets; 





 d) For business developments, likelihood of employment opportunities being created for residents, and the quality of those opportunities; and 





 e) For residential developments, how substantially, if at all, the proposal contributes to housing diversity. 





STANDARD OF REVIEW 





 Generally, summary judgment may be entered if the "pleadings, depositions, answers to interrogatories, and responses to requests for admission ... together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56 (c). In viewing the factual record presented as part of the motion, the court draws "all logically permissible inferences" from the facts in favor of the non-moving party. Willitts v. Roman Catholic Archbishop of Boston, 411 Mass. 202 , 203 (1991). "Summary judgment is appropriate when, 'viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.'" Regis College v. Town of Weston, 462 Mass. 280 , 284 (2012), quoting Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117 , 120 (1991). 





DISCUSSION 





 The parties agree that there are no disputes of material fact here. BBCC argues that it is entitled to summary judgment as a matter of law because the ZBA exceeded its authority under the ZBL in imposing, as a condition to BBCC's special permit, the requirement that one of BBCC's four apartments qualify for inclusion on the Chapter 40B Subsidized Housing Inventory, the Affordable Housing Condition. The Town argues in its Cross-Motion that it is entitled to judgment as a matter of law because the ZBA had the authority to impose the Affordable Housing Condition in order that the Project satisfy the consideration set forth in ZBL § 906.2(2)(e), "[f]or residential developments, how substantially, if at all, the proposal contributes to housing diversity." 





 This court's examination of zoning appeals is governed by familiar principles. As described by the Supreme Judicial Court in E & J Props., LLC v. Medas, 464 Mass. 1018 , 1019 (2013), quoting Wendy's Old Fashioned Hamburgers of N.Y., Inc. v. Board of Appeals of Billerica, 454 Mass. 374 , 381 (2009), which in turn quotes Pendergast v. Board of Appeals of Barnstable, 331 Mass. 555 , 558 (1954), "[j]udicial review of a zoning board's decision pursuant to G. L. c. 40A, § 17, 'involves a peculiar combination of de novo and deferential analyses.'" In Shirley Wayside Ltd. P'ship v. Board of Appeals of Shirley, 461 Mass. 469 , 474-475 (2012), the Supreme Judicial Court described the process of the trial court's review as follows: 





 The trial judge makes his own findings of facts and need not give weight to those the board has found. See G. L. c. 40A § 17; Pendergast v. Board of Appeals of Barnstable, supra at 558-559. The judge then "determines the content and meaning of statutes and by-laws and ... decides whether the board has chosen from those sources the proper criteria and standards to use in deciding to grant or to deny the variance or special permit application" (citations omitted). Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68 , 73-74, 794 N.E.2d 1198 (2003). ... After determining the facts and clarifying the appropriate legal standards, the judge determines whether the board has applied those standards in an "unreasonable, whimsical, capricious or arbitrary" manner. Wendy's, supra at 382, quoting Roberts v. Southwestern Bell Mobile Sys., Inc., 429 Mass. 478 , 487, 709 N.E.2d 798 (1999). 





 The facts here having been agreed to by the parties and set forth above, the next step in the analysis is to determine the content and meaning of statutes and bylaws and to decide whether the ZBA has chosen the proper criteria and standards to use in deciding to grant the special permit application with the condition imposed here. The relevant statute is G. L. c. 40A, § 9, which provides in pertinent part: 





 Zoning ordinances or by-laws shall provide for specific types of uses which shall only be permitted in specified districts upon the issuance of a special permit. Special permits may be issued only for uses which are in harmony with the general purpose and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein; and such permits may also impose conditions, safeguards and limitations on time or use. 





 Zoning ordinances or by-laws may also provide for special permits authorizing increases in the permissible density of population or intensity of a particular use in a proposed development; provided that the petitioner or applicant shall, as a condition for the grant of said permit, provide certain open space, housing for persons of low or moderate income, traffic or pedestrian improvements, installation of solar energy systems, protection for solar access, or other amenities. Such zoning ordinances or by-laws shall state the specific improvements or amenities or locations of proposed uses for which the special permits shall be granted, and the maximum increases in density of population or intensity of use which may be authorized by such special permits. 





Of note, § 9 does permit the imposition of "conditions, safeguards and limitations on time or use" by the special permit granting authority, and does permit conditioning increases in density of population or intensity of use on the applicant's provision of, among other things, "housing for persons of low or moderate income." 





 Regarding the pertinent bylaw provisions for this Project, located in the Neighborhood Business District 1, the starting point is ZBL § 421.3, which allows by special permit and site plan review uses allowed by § 421A.3 (of the Neighborhood Business Light section of the ZBL). Section 421A.3(3) in turn allows, by special permit and site plan review, dwellings in a business structure above the ground floor. The ZBL contains a separate provision governing the granting of special permits in neighborhood business districts, § 424, which lists the criteria to be considered by the ZBA (protection of abutters from noxious uses, off-street parking, vehicular and pedestrian movements, adequate water supplies, adequate provisions for sewage, shade trees and conformance with ZBL sign regulations). In its Decision, the ZBA found that "[t]he proposed use of the Premises as a mixed use space including office space on the first floor with four residential apartments above the ground floor is allowed by Special Permit under Bylaw Section 421A.3 and meets the criteria set forth in Bylaw Section 424," PSOMF, Ex. A, Decision at 4, a conclusion that BBCC presumably embraces. 





 Section 906 of the ZBL, which establishes the ZBA and sets forth its duties and powers, also comes in to play. In particular, § 906.2 empowers the ZBA to hear and decide special permit applications "as provided in this Bylaw, subject to any general or specific rules therein contained, and including authority to impose appropriate terms, conditions and safeguards in its decisions." That section also sets forth sixteen issues for the ZBA's consideration in granting a special permit, stating that "[a]pplications shall be approved only upon the Board's written determination that the proposal's benefits to the Town will outweigh any adverse effects for the Town or vicinity after consideration of the following, among other things." ZBL § 906.2. In particular, § 906.2(2)(e) requires that the ZBA consider, "[f]or residential developments, how substantially, if at all, the proposal contributes to housing diversity." The ZBA reads that provision as allowing it to consider affordable housing in granting special permits and to impose the Affordable Housing Condition here, requiring that one of the four one-bedroom apartment units be affordable. That interpretation is at the heart of this appeal. 





 The rules of construction to be applied in construing zoning bylaw provisions were set out generally in Shirley Wayside Ltd. P'ship, 461 Mass, at 477: 





 We determine the meaning of a bylaw "by the ordinary principles of statutory construction." Framingham Clinic, Inc. v. Zoning Bd. of Appeals of Framingham, 382 Mass. 283 , 290, 415 N.E.2d 840 (1981). We first look to the statutory language as the "principal source of insight into legislative intent." Adoption of Daisy, 460 Mass. 72 , 76, 948 N.E.2d 1239 (2011), quoting Water Dep't of Fairhaven v. Department of Envtl. Protection, 455 Mass. 740 , 744, 920 N.E.2d 33 (2010). When the meaning of the language is plain and unambiguous, we enforce the statute according to its plain wording "unless a literal construction would yield an absurd or unworkable result." Adoption of Daisy, supra, quoting Boston Hous. Auth. v. National Conference of Firemen & Oilers, Local 3, 458 Mass. 155 , 162, 935 N.E.2d 1260 (2010). We "endeavor to interpret a statute to give effect 'to all its provisions, so that no part will be inoperative or superfluous.'" Connors v. Annino, 460 Mass. 790 , 796, 955 N.E.2d 905 (2011), quoting Wheatley v. Massachusetts Insurers Insolvency Fund, 456 Mass. 594 , 601, 925 N.E.2d 9 (2010). 





Although "[d]eference is also owed to a local zoning board because of its special knowledge of 'the history and purpose of its town's zoning by-law,'" Wendy's Old Fashioned Hamburgers of N.Y., Inc., 454 Mass. at 381, "the 'interpretation is not dispositive.'" Guardione v. Town of Longmeadow, 74 Mass. App. Ct. 118 , 120 (2009) quoting Tanner v. Board of Appeals of Boxford, 61 Mass. App. Ct. 647 , 649 (2004). Employing those rules of construction, this court declines to defer to the ZBA's interpretation of § 906.2(2)(e). That interpretation is not required by the plain language of the provision, is inconsistent with other provisions of the ZBL and potentially exceeds the authority granted by G. L. c. 40A, § 9. 





 Section 906.2(2)(e) requires the ZBA to consider a proposal's impact on "housing diversity." The term is not defined in the ZBL. In response to the court's request, BBCC suggests that there is no meaning expressed in the ZBL or the record before this court, and the ZBA suggests that, whatever its meaning, it includes "housing available to differing income levels." Defendants' Supplemental Memorandum In Support Of Its Opposition To Plaintiffs' Motion For Summary Judgment And Its Cross-Motion For Summary Judgment at 3. Resources collected in Arnab Chakraborty and Andrew McMillan, Is Housing Diversity Good for Community Stability?: Evidence from the Housing Crisis, Journal of Planning Education and Research (November 2, 2018), https://doi.org/10.1177/0739456X18810787, suggest that the term is used to denote different kinds of housing: 





 Ever since Jane Jacobs (1961) emphasized the diversity of structures as a key component of a vibrant community, housing diversity has been widely adopted by many planning institutions as a worthy goal. For example, the American Planning Association's (2006) Policy Guide on Housing notes that a mix of housing types will help ensure community viability. The US Green Building Council (2013) notes that a range of housing types can "promote socially equitable and engaging communities by enabling residents from a wide range of economic levels, household sizes, and age groups to live in a community." Similarly, the Congress for the New Urbanism's charter (Leccese and McCormick 2000, 3) notes that "within neighborhoods, a broad range of housing types and price levels can bring people of diverse ages, races, and incomes into daily interaction, strengthening the personal and civic bonds essential to an authentic community," Furthermore, Smart Growth America (2016) notes that a mix of housing units allows that "people with different housing needs can all live in the same neighborhood, and that residents can remain in a neighborhood even if their housing needs change." 





Using that definition, affordable housing certainly could be, but is not required to be, a component of housing diversity. Contrary to the ZBA's interpretation, it may simply mean a mix of different housing types without consideration of whether subsidized housing is part of the mix. 





 The plain language not resolving the issue, the next area of inquiry is how the ZBA's interpretation of § 906.2(2)(e) fits with other provisions of the ZBL. As set forth above, Article 500 and Article 700 of the ZBL expressly address affordable housing. While not a model of clarity (the HPP acknowledges that provisions addressing the production of affordable housing are scattered about the ZBL), the affordable housing provisions in the ZBL appear to be founded largely on § 560, entitled "Inclusionary Housing," which is intended to "outline and implement a coherent set of policies and objectives for the development of affordable housing in compliance with the Duxbury Comprehensive Plan, G.L. c. 40B sec. 20-23." ZBL § 560.1. Pursuant to § 560.3, "[t]his Bylaw shall apply to the construction of six (6) or more dwelling units in accordance with Section 700 of the Zoning Bylaw" and, pursuant to § 560.5, the ZBA "shall deny any application for a special permit for development under Sections 530, 540 and 700, and 

this section if the applicant for special permit approval does not agree that ... [a]t least ten percent (10%) of the units ... shall be established as affordable housing units." While it is a bit circular, Article 700 incorporates, at § 718, the inclusionary housing requirements of § 560 where six or more dwelling units are proposed. Section 530, entitled "Division of Land And Development Of Multiple Dwellings," provides that the construction of six or more dwelling units on land not requiring division or subdivision requires a special permit under Article 700, which, as noted, incorporates the inclusionary housing requirements of § 560 where six or more dwelling units are proposed. Section 540, entitled "Residential Conservation Cluster," also requires, as a condition of the grant of any special permit for a development containing six or more lots or dwelling units, compliance with the inclusionary housing requirements of § 560. Section 570, entitled "Affordable Housing," regulates the construction of affordable housing on "qualified pre-existing non-conforming lots." ZBL § 570.1. Among the requirement of § 570, the lot must have a minimum area of ten thousand square feet and twenty-five feet of frontage, ZBL § 570.3(3)(a), and the unit created must be subject to a restriction that it remain affordable, ZBL § 570.4. From a review of these provisions, this much is clear: leaving aside § 570's preexisting nonconforming lot provisions, the Town, in adopting the ZBL, determined that projects proposing six or more dwelling units, not four units, must set aside a percentage of those units for affordable housing. 





 As a matter of statutory construction, given the attention paid to affordable housing in other parts of the ZBL, it seems exceedingly unlikely that the Town, in adopting § 906.2(2)(e), intended, without referencing any of those sections or even using the words "affordable housing," to give the ZBA discretionary authority to impose different requirements. See Livoli v. Zoning Bd. of Appeals of Southborough, 42 Mass. App. Ct. 921 , 923 (1997) ("The flaw in the argument is that the drafters of the by-law might easily have inserted a height limit for accessory structures, as they did for principal structures, and they elected rather conspicuously not to, thereby igniting still another canon of construction, namely, inclusio unius est exclusio alterius."). In addition, the ZBA's interpretation runs afoul of the teaching of Middlesex & B.S.R. Co. v. Board of Alderman of Newton, 371 Mass. 849 (1977). 





 In Middlesex, the board of alderman ("Board") of the city of Newton, acting in their capacity as the special permit granting authority under Newton's zoning ordinance, granted a special permit to the plaintiff to erect fifty-four dwelling units in a garden apartment development. The plaintiff appealed to the Superior Court to challenge the imposition of two conditions, one requiring that the owners be responsible for the removal of solid waste by a private rubbish collector and the other requiring that the plaintiff lease five of the units to the Newton Housing Authority for low-income housing. The Superior Court judge found that both conditions were valid. On appeal, the Supreme Judicial Court upheld the first condition, but annulled the second. It is the court's analysis of the second condition that is germane here. 





 First, the Middlesex court reviewed the relevant zoning provisions. Those provisions allowed the board to give permission for the construction of garden apartments subject to stated requirements, all of which had been met. The court then noted that "the outer limits of the powers of the board with respect to special permits are those prescribed by G. L. c. 40A, §§ 4 [the predecessor to § 9] and 15," that § 4 empowered the Board to "grant special permits 'in appropriate cases and subject to appropriate conditions and safeguards,'" and that § 15 allowed the Board to "hear and decide applications for special permits for exceptions as provided in section four." 371 Mass. at 855-856. According to the court, "[t]here is no language anywhere in the statute or in the Newton zoning ordinance which expressly authorized the board to impose" the second condition. Id. at 856. After considering and rejecting the board's argument that it could impose the condition under the Home Rule Amendment, art. 89 of the Amendments 

to the Massachusetts Constitution, id. at 856-857, the court turned to the board's argument that its imposition of the second condition was founded on broad considerations of general public welfare. 





 According to the board, G. L. c. 40A having been interpreted as an affirmative measure to alleviate housing shortages for low income and elderly persons and there being no constitutional obstacle to accomplishing the ends contemplated by the board in imposing the second condition, it therefore had the power to impose the affordable housing condition on the plaintiff. While agreeing with the board that municipalities could, acting in accordance with lawful procedures, undertake the expenditure of public funds to provide housing for low income and elderly persons, the Middlesex court drew a line between what could be accomplished administratively and what could be accomplished legislatively: 





 We hold that the administrative board authorized to pass on applications for special permits under the zoning ordinance is without power to make the important policy decisions involved in committing a municipality to a program of public housing for low income or elderly persons, and that the board may not exact or compel a contribution to the cost of such a program from applicants for special permits. The board is without power to impose such a price on special permits which it is otherwise authorized to issue. 





Id. at 858. 





 What was said in Middlesex applies with even more force here. Not only is the ZBA, as an administrative board, without authority to make the policy determination that it made here in requiring that one of BBCC's four units be affordable, but it has done so in the face of a different policy decision made by the legislative body of the Town, town meeting: that the threshold for imposing an affordability component is not reached until six units are proposed. Because its interpretation of § 906.2(2)(e)-its claimed source of authority-is not supported as a matter of statutory construction and because it exceeded its authority in imposing the affordable housing condition, the ZBA's Affordable Housing Condition cannot stand. Also, although not argued by the parties, the court also notes that this case raises a substantial question as to whether the imposition of an affordable housing requirement in the ZBL with no concomitant benefit to the applicant, as seems to be the case with respect to a number of its provisions, is authorized by G. L. c. 40A, § 9 (permitting increases in density or intensity of use conditioned on the grant of identified amenities by the applicant, but not otherwise). 





 What remains to be decided is the appropriate remedy here. "[I]t would ordinarily be error for the court to annul a substantial condition attached to the grant of a special permit, allowing the permit to stand without the condition." Lovaco, Inc. v. Zoning Bd. of Appeals of Attleboro, 23 Mass. App. Ct. 239 , 243 (1986). Moreover, the ZBA has already concluded in its Decision that "[a]bsent such affordable unit, the proposed development will not provide sufficient housing diversity to satisfy the special permit criteria under Section 906.2(2)(e)," PSOMF, Ex. A, Decision at 4, with the result that, on remand, the ZBA would deny BBCC's application in the absence of the Affordable Housing Condition. On the record here, however, such a decision would plainly be arbitrary and capricious. The ZBA has already determined that BBCC's Project meets the requirements of ZBL § 424. Regarding the requirements of ZBL § 906, the only issue is whether, as required by § 906.2(2)(e), "the proposal contributes to housing diversity." The Project will add four one-bedroom apartments to the Town's housing stock. The HPP documents that 90% of the Town's housing stock consists of single-family homes, that 89% are owned and that "[t]here are few rental options," so the addition of BBCC's four units would perforce "contribute to housing diversity." No different conclusion could reasonably be reached. Accordingly, this court declines to remand this matter for the ZBA's further consideration in light of this ruling, and will instead order it remanded for the limited purpose of issuing the special permit without the Affordable Housing Condition. See Wendy's Old Fashioned Hamburgers of New York, Inc., 454 Mass. at 388 ("an order of particular relief may be appropriate where remand is futile and would postpone an inevitable result."). 





CONCLUSION 





 Based on the undisputed facts and for the foregoing reasons, the Motion is ALLOWED and the Cross-Motion is DENIED. Judgment shall enter annulling the Decision and remanding this matter to the ZBA with instructions to issue the special permit without the Affordable Housing Condition. 





 SO ORDERED 





FOOTNOTES
[Note 1] Although the caption of the complaint filed in this action so designates the plaintiffs, the proper plaintiff is Brown Built Construction Corp., William Scott Brown being neither the property owner nor the applicant for the special permit at issue here. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 ,618 (1968) ("[C]orporations are generally to be regarded as separate from each other and from their respective stockholders (see Marsch v. Southern New England RR 230 Mass. 483 , 498) where there is no occasion 'to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries.' See e.g. M. McDonough Corp. v. Connolly, 313 Mass. 62 , 65-66."). 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.